**Jaime LOPEZ–CHAVEZ, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 99–70251.**

United States Court of Appeals, Ninth Circuit.

Submitted Nov. 15, 2000 [1]

Filed July 26, 2001

---

**64.** *Id.*

**65.** 42 U.S.C.1973aa–1(g).

**66.** 42 U.S.C.1973aa–1(a).

**1.** The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

Gary H. Manulkin, Manulkin, Glaser & Bennett, Fountain Valley, California and Peter Schey, Center for Human Rights and Constitutional Law, Los Angeles, California, for the petitioner.

Christopher C. Fuller, Office of Immigration Litigation, Department of Justice, Washington, D.C., for the respondent.

Before: PREGERSON, NOONAN, and SILVERMAN, Circuit Judges.

Opinion by Judge SILVERMAN; Dissent by Judge PREGERSON.

SILVERMAN, Circuit Judge:

We previously have held that the INS can prove alienage with a properly authenticated INS form I–213. *Espinoza v. INS*, 45 F.3d 308, 311 (9th Cir.1995). The issue in this case is whether an authenticated INS form WR–424 also is admissible to prove alienage. Although the WR–424 is smaller than the I–213, it contains the same information that we held to be critical in *Espinoza* and is prepared in essentially the same way. We therefore hold that a properly authenticated WR–424 is admissible in a deportation hearing to prove its contents.

### I. Procedural Background

Jaime Lopez–Chavez petitions for review of the order of the BIA that he is deportable to Mexico for entering the United States without inspection. We have jurisdiction under Section 106(a) of the INA, 8 U.S.C. 1105a(a), to review this final deportation order.[2]

The Orange County Sheriff's Office arrested Lopez–Chavez (and 150 other striking drywall workers) on July 2, 1992 and brought him to Orange County Jail. INS Officer Miera interviewed Lopez–Chavez in the jail later that day. Officer Miera questioned him about his name, place of birth, nationality, and means of entry into the United States. Lopez–Chavez answered that he was born in Nochixtlan, Mexico, was a Mexican national and that he entered the United States without inspection on or about January 5, 1989. Miera recorded Lopez–Chavez's responses on INS form WR–424, a 3 by 5 form completed by agents when they interview aliens. The WR–424 contains blanks for the agents to fill in the following information: name of the alien questioned; place and date of birth; status at entry; place, date, and time of entry; place, date, and time questioned; and the officer's name.

At his deportation hearing months later, Lopez–Chavez stated his name, then asserted the Fifth Amendment privilege against self-incrimination regarding his alienage. At that point, the INS offered into evidence a certified copy of the INS form WR–424. Lopez–Chavez's counsel objected to the admission of the WR–424 on the grounds of lack of authentication, inability to cross-examine the maker of the document, and its alleged inherent unreliability. Officer Miera, the maker of the document, was then called to the stand. He testified that the WR–424 contained his handwriting and that he had prepared it from answers provided to him by Jaime Lopez–Chavez at the Orange County Jail on July 2.[3]

---

**2.** On September 20, 1996, the Illegal Immigration Reform and Immigrant Responsibility Act was signed by the President. Pub.L. No. 104–208, 110 Stat. 3009. Sections 306(a) and 306(b) repeal INA § 106. See 8 U.S.C. § 1252. The transitional rules of the IIRIRA apply to this case because the INS commenced deportation proceedings on July 10, 1992 and the BIA issued its decision on February 8, 1999. IIRIRA § 306(c)(1) as corrected by Pub.L. No. 104–302, § (2)(1), 110 Stat. 3567; *Kalaw v. INS*, 133 F.3d 1147, 1150 (9th Cir.1997). The appeal is timely under the transitional rules because it was filed on March 10, 1999, within 30 days of the BIA's decision in this case.

**3.** The dissent says that Officer Miera was unable to recall the source of the information he used to fill out the WR–424. We respectfully disagree with our dissenting colleague's reading of the record. Officer Miera unequivocally testified several times on direct examination that all of the information reflected on the WR–424 form came directly from Lopez–Chavez:

[By INS counsel:]
Q. Let me show you a—a copy of the—of the Form 424 that bears the respondent's name Jaime Lopez Chavez. Have you ever seen that document before?

A. Yes, I have. I prepared it.

Q. Is that document entirely—all the answers thereto entirely in your own handwriting?

A. Yes.

Q. Does it bear your name on that document?

A. Yes, it does down at the bottom.

Q. Now, how did you get the answers on that—on those blank spaces there?

A. I interviewed Mr. Lopez at the Orange County Jail.

* ER 84, lines 6–17.

Q. Okay. So, you basically asked the man whose name appears on that form all these questions relating to that form?

A. Yes, I did.

Q. And then you—what did you do—You—You—Did you—What did you do when he answered those questions?

A. I filled out the form based on the information he gave me and if you notice here also, on the side, I even asked him some other questions—if he had family, what ties he had in the U.S. and so forth—some notations.

Q. And it's entirely in you own writing-

A. Yes, that's all —

Q. — or printing? All right.

A. It's all my writing.

ER 87, lines 7–22.

On cross-examination, there was the following colloquy:

[By counsel for Lopez–Chavez:]

Q. Did any of the information on the 424 come from any of the records at the Orange County Sheriff's Department?

A. No.

Q. Did you review a booking log or a booking record in—in the respondent's case.

A. The—Each—Each individual coming to us as I recall had a computerized form from the county in—in every—I remember seeing that. And if the—the alien himself had it, we would look at it and give it back to him.

Q. What sort of information was contained on this computerized—this computer printout?

A. It had a name on there and I—I don't—don't know what other information it may have had but I recall that they did have a name—name on the form.

Q. And in any of the cases you processed on July 2nd, did you note any of that—any information on the computer printout on any notes you might have taken?

A. I didn't keep any notes. All I had—All I kept was the 424 and then I gave that to the supervisor.

Q. Did any of the information on the computer printouts make its way directly onto the 424?

A. No, I don't—I didn't need that type of information because I—I can speak the language well enough that I could interview him well enough to extract what I needed for the 424.

* Q. But you don't remember for sure whether you took any information from the computer printout?

A. No, I don't recall.

ER 104, line 18 to ER 105, line 21.

Lopez–Chavez's counsel did not pursue on cross-examination the question of what, if anything, came from the printout. The judge also put questions to Officer Miera:

[By the Court:]

Q. The Court has just a couple of questions. Now, sir, you indicated previously that on July 2, 1992 you interviewed a gentleman by the name of—who identified himself to you as Jaime Lopez Chavez. This person was it the custody of the Orange County Sheriff. The place of the interview was the Orange County Jail. Is that correct?

A. That's correct, sir.

Q. All right. Now, again, referring to the 424 that was previously shown to you, I show it to you again. The markings that appear on this form are entirely in your-TheyThe hand printed marking are entirely in your writing. Is that correct?

A. That's correct, sir.

Q. And the information that appears in the first six linesthat is, after name; place of birth; date of birth; status at entry; place, date and time of entry; -well, the first five lines, that—that is recorded information that you received from the person that you interviewed with that name?

A. Yes, sir, that's correct.

Q. All right. Do you have any reason to believe that the information that was provided to you at that time by that individual in response to questions regarding those matters was incorrect?

A. No, that was correct. It was correctly—

ER 129, line 22 to ER 130 line 22.

The form showed the following information:

NAME: *LOPEZ-CHAVEZ, Jaime*

PLACE OF BIRTH: *NOCHIXTLAN, MEXICO*

DATE OF BIRTH: *1-5-66*  NATIONALITY: *MX*

STATUS AT ENTRY: *EWI* [4]

PLACE, DATE & TIME    AM
OF ENTRY: *1-5-90 near SYS*    PM [5]

DATE, PLACE & TIME
QUESTIONED: *7/2/92/OCJ* [6]

TIME & PLACE ARRESTED: *7/2/92*

APPREHENDING OFFICER: *Miera*

The IJ ruled that the form had established Lopez–Chavez's alienage and that therefore, the burden shifted to Lopez–Chavez to demonstrate a legal time, place and manner of entry into the United States. Because Lopez–Chavez offered no evidence of lawful entry, the IJ found him deportable but granted Lopez–Chavez's request for voluntary departure.

On appeal, the BIA held that: (1) the certified WR–424 was properly admitted because Miera testified as the maker that it was an official document completed in the routine performance of his duties and contained information provided to him by Jaime Lopez–Chavez, (2) the identity of the names of respondent and the person described in the form was sufficient to prove that the form pertained to him, in the absence of evidence to the contrary; and (3) the WR–424, along with the agent's testimony, established alienage, shifted the burden to Lopez–Chavez to show time, place and manner of entry. The BIA dismissed the appeal.

## II.  Standard of Review

■ We review the BIA's finding of deportability to determine if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Murphy v. INS*, 54 F.3d 605, 608 (9th Cir.1995).

## III.  Discussion

■ Lopez–Chavez argues that the WR–424 and the testimony of the INS agent in this case did not establish deport-

---

The judge then concluded that the information on the WR–424 came from Lopez–Chavez. We have no basis on which to find that the judge's conclusion was erroneous. The only fair reading of Officer Miera's testimony in context is that the information reflected on the WR–424 form came from Lopez–Chavez and that Officer Miera did not recall resorting to any other source.

4. "EWI" means "entered without inspection."

5. "SYS" means San Ysidro.

6. "OCJ" means "Orange County Jail."

ability by clear and convincing evidence. The INS had the burden of proving alienage by "clear, convincing, and unequivocal evidence." 8 C.F.R. § 240.24(a); *Woodby v. INS,* 385 U.S. 276, 281, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966); *Murphy,* 54 F.3d at 608. Once the INS proves alienage, the burden shifts to the alien to prove the time, place and manner of his entry into the United States. 8 U.S.C. § 1361 (1966); *Murphy,* 54 F.3d at 608. If the alien fails to meet this burden, he is presumed to be in the United States in violation of the law and deportable. *Iran v. INS,* 656 F.2d 469, 471 (9th Cir.1981).

■■■■ We already have held that the INS can prove alienage with an authenticated I–213 form. *Espinoza v. INS,* 45 F.3d 308, 311 (9th Cir.1995). In *Espinoza,* we held that the properly admitted I–213, which contained the alien's name, citizenship and an indication of entry without inspection, was clear and convincing evidence of deportability that shifted the burden to the alien to demonstrate legal entry. *Espinoza,* 45 F.3d at 311. The WR–424 is the size of an index card, but it contains the same basic information—collected in the same way—as its bigger brother, the Form I–213. The reliability of the information does not depend on the size of the paper. What matters is how the form is completed, when it is completed, the absence of coercion or duress in securing the information, and whether there is any reason to believe that the document does not pertain to the person in question. It must be shown that the document has been certified by the INS District Director as a true an accurate reflec-

tion of INS records. *See Iran,* 656 F.2d at 472; *Tejeda–Mata v. INS,* 626 F.2d 721, 724 (9th Cir.1980); *Trias–Hernandez v. INS,* 528 F.2d 366, 369 (9th Cir.1975). We hold that if a proper foundation is laid, a certified WR–424 form is admissible to prove its contents to the same extent as a Form I–213.

■■■■ In this case, the WR–424 was properly certified. There was no evidence that the information on the form was obtained by coercion or duress, or from anyone other than Lopez–Chavez himself. Although the WR–424 was probably admissible as a record of a regularly conducted activity under Rule 803(6), Federal Rules of Evidence, we held in *Espinoza* that an Immigration Judge is not bound by the strict rules of evidence at a deportation hearing. What matters is that the alien is accorded due process. *Espinoza,* 45 F.3d at 310. The admission of the WR–424 into evidence did not violate Lopez–Chavez's right to due process.

What did the WR–424 prove? It established that Lopez–Chavez was born in Mexico, that he is a Mexican national, and that he entered the United States without inspection. That evidence was not contradicted in any way. A prima facie case of alienage was thus established, shifting the burden to Lopez–Chavez to prove his lawful entry into the United States. Because he offered no such evidence, the record clearly and convincingly established Lopez–Chavez's deportability.[7]

PETITION FOR REVIEW DENIED.

---

7. Lopez–Chavez also argues that the admission of the WR–424 violated his due process rights because, he claims, it was obtained in violation of 8 C.F.R. § 287.3. However, that regulation does not apply in this case. Section 287.3 applies only to an alien arrested on immigration charges without a warrant. Lopez–Chavez was not under warrantless arrest

on immigration charges at the time he spoke to Agent Miera on July 2, 1998. Rather, he was in state custody incident to his arrest on other charges by the Orange County Sheriff. Lopez–Chavez was not arrested on immigration charges until July 10, 1998, when the INS served him with an arrest warrant.

PREGERSON, Circuit Judge, dissenting:

## I.

To understand what's involved in this case, a full account of the facts is necessary. On July 2, 1992, the Orange County Sheriff's Department arrested 150 striking drywall workers in Mission Viejo, California, and brought them to the Orange County Jail. After the striking workers were brought to the jail, INS agents performed a "routine jailhouse screening" and "identified 86 of the [strikers] arrested in Mission Viejo as probably being in the country illegally. Of those, 74 had been released from jail in Orange County and right into INS custody...." Michael Flagg, *INS to Query Employers Who Hired Drywall Crews Labor,* L.A. TIMES, July 14, 1992, at B1. Of these seventy-four, the INS eventually identified fifty-two workers as undocumented. Jeordan Legon, *Drywall Strike: Sheriff's Official Denies Department Helping INS,* ORANGE COUNTY REGISTER, July 18, 1992, at B8 (describing how the INS identified the undocumented workers through "routine record checks" at the Orange County Jail).

Petitioner Jaime Lopez–Chavez was one of the striking drywall workers who was arrested and brought to the Orange County Jail. Epifano Miera was one of the INS agents who was called in to help screen the arrestees to determine whether they were illegally in the country. During Lopez–Chavez's deportation hearing, the INS called Miera to testify about the circumstances under which he allegedly prepared the WR–424 Form that was used during Lopez–Chavez's deportation proceedings to prove his alienage. I use the word "allegedly" because unlike the I–213 Form, the WR–424 Form does not include a space for the preparer of the form to indicate his or her name. Also unlike the I–213, the WR–424 does not require its preparer to sign the form. The INS apparently assumed that Miera prepared the WR–424 because his name was in the "Apprehending Officer" space, even though Miera later testified that he did not, in fact, arrest Lopez–Chavez.

Miera began his testimony by stating that he did not recognize Lopez–Chavez, and that he had no specific recollection of his interview in the Orange County Jail with Lopez–Chavez.[1] Miera testified that on July 2, 1997, he interviewed ten of the arrested drywall workers for about five minutes each. Miera explained that the WR–424 is a "general purpose type of form" that is used for "many, many purposes," including interviewing aliens who are arrested "out in the field," as well as interviewing aliens who are already in jail. Miera later testified on cross-examination that "we don't have a form that we would use at the county jail," and that the WR–424 form was used as a default. Miera stated that he had testified in about eighty other deportation proceedings, and that he could not recall ever testifying about preparing a WR–424 Form. In contrast, Miera stated that he had previously testified about preparing I–213 Forms.

Miera left several spaces on Lopez–Chavez's WR–424 blank, including the time and place that Lopez–Chavez was arrest-

1. On cross-examination, Lopez–Chavez's attorney's first question to Officer Miera was: "What is the respondent's name?" Officer Miera responded, "Jaime—I don't recall. It's there on the form." Lopez–Chavez's attorney asked Miera whether he had any recollection of Lopez–Chavez, and Miera responded that he did not. Miera testified that he interviewed about ten people on July 2 at the Orange County Jail, and that he could not remember any of their names. Lopez–Chavez's attorney then asked: "So, for all you know, this individual who's sitting here in court might not be the respondent?" Miera replied, "That's correct. It may not be."

ed, and the time that Miera conducted the interview with Lopez–Chavez. Miera conceded on the stand that he "erroneously" omitted that information. Miera also testified that he filled in the date of the interview in the space on the form for recording the time and place of Lopez–Chavez's arrest. Miera testified that he had "no idea" when or where Lopez–Chavez was arrested.

Miera also admitted that he was not, in fact, the "Apprehending Officer," and that he put his name in that space on the WR–424 pursuant to "the guidance that we get from our agency that that's the way we're going to fill them out." Miera stated that he did not know who actually arrested Lopez–Chavez. As stated above, Miera did not sign the WR–424, nor does the form indicate the name of the person who prepared it. The WR–424 also does not indicate the source of the information contained on the form, i.e., whether it came from an interview with the alleged alien or from some other source. This omission is significant in this case because Miera testified that the Orange County Sheriff's Department provided him with a computer printout for each individual he interviewed on July 2, 1992, but that he couldn't recall what information was on the printout. Miera further testified that he couldn't recall whether any of the information on the printout made its way onto his WR–424 Form. Therefore, it is possible that some of the information on Lopez–Chavez's WR–424 came from the Orange County Sheriff's Department computer printout.[2]

Lopez–Chavez's attorney, Niels Frenzen, showed Miera the WR–424, and pointed out where it stated that Lopez–Chavez's status at entry was "EWI," which stands for "entered without inspection." Frenzen asked Miera, "Did the respondent in this case tell you he entered EWI?" Miera responded, "No." Miera explained that Lopez–Chavez probably told Miera that he came in through the mountains or the beach, but that Miera could not recall exactly what Lopez–Chavez had told him.

Aside from omitting facts about Miera's testimony, the majority also glosses over how the INS came to use a WR–424 instead of the more detailed and complete I–213 to prove Lopez–Chavez's alienage. Lopez–Chavez's first hearing was set for

---

2. The majority asserts that "[t]he only fair reading of Officer Miera's testimony in context is that the information reflected on the WR–424 form came from Lopez–Chavez himself and that Officer Miera did not recall resorting to any other source." Maj. Op. at 1180 n. 3. It is undisputed, however, that Miera could not recall *any* details of his encounter with Lopez–Chavez. Miera testified that he: (1) did not recognize Lopez–Chavez; (2) could not recall Lopez–Chavez's name; and (3) could not recall whether he took information from the computer printout. Moreover, the following colloquy ensued after Miera was asked why he indicated on the WR–424 that Lopez–Chavez entered without inspection ("EWI"):

A. [Lopez–Chavez] told me he entered the country illegally.
Q. And on what do you base that?
A. Based on my interview with him at the time at the county jail.

Q. So, are you now remembering your interview with him at the county jail?
A. Well, I'm remembering it based on the information on the 424.
Q. So, what you're remembering right now is simply that your handwriting is written right on this form EWI.
A. That's correct.
Q. That's all you remember, isn't that true?
A. Well, sure, that's correct.

Given that Miera could not remember any details of his encounter with Lopez–Chavez, but instead was providing testimony based on what was written on the WR–424, the only "fair reading" of Miera's testimony is that it is impossible to know whether the information on the WR–424 came from Lopez–Chavez or from some other source. Miera's testimony certainly does not amount to *clear and convincing evidence* that Lopez–Chavez provided all of the information on the WR–424.

September 15, 1992. During that hearing, the INS sought to introduce an I–213 to prove Lopez–Chavez's alienage. Through counsel, Lopez–Chavez objected to the introduction of the I–213 on several bases, including: (1) the source of the information was not identified in the I–213; (2) the information on the I–213 was self-contradictory; and (3) the information on the I–213 was obtained through coercion. Lopez–Chavez indicated that he would move to suppress the I–213, and that a hearing had already been scheduled to question the INS officials who had interrogated the drywall workers in the Orange County Jail. Lopez–Chavez's case was then continued until November 19, 1992.

At the November 19 hearing, the INS did not again seek to introduce the I–213, but rather introduced the WR–424 to prove Lopez–Chavez's alienage. The record does not reflect why the INS abandoned the I–213, but we can infer that the I–213 was too unreliable to prove Lopez–Chavez's alienage by clear and convincing evidence. As the majority points out, Lopez–Chavez objected to the introduction of the WR–424 on several different bases. The majority fails to single out the two of the most important objections made by Lopez–Chavez: that the source of the information contained on the WR–424 was not identified on the form itself, and that neither the BIA nor any court of appeals has recognized the WR–424 as sufficient for the INS to meet its burden of proving alienage by clear and convincing evidence.

Having presented a full account of the facts, I will now explain why I think the majority got this one wrong.

## II.

The "sole test" governing the admission of evidence in deportation proceedings is "whether the evidence is probative and its admission is fundamentally fair." *Espinoza v. INS,* 45 F.3d 308, 309 (9th Cir.1995)

(citing *Trias–Hernandez v. INS,* 528 F.2d 366, 369 (9th Cir.1975)). In *Espinoza,* we held that an I–213 Form is probative on the issue of entry, and that its admission is fair *unless* the alleged alien can demonstrate that the I–213 is untrustworthy. *Id.* at 309–11. This rule "closely tracks" the Federal Rules of Evidence, which "exempt public records containing factual findings from an official investigation from the prohibition on hearsay 'unless the sources of information or other circumstances indicate lack of trustworthiness.'" *Id.* at 310–11 (quoting Fed.R.Evid. 803(8)(c)). We decided that the I–213 in *Espinoza* was trustworthy—and therefore admissible—because it was "prepared in accordance with normal recordkeeping requirements, and [was] signed and dated by the officer who completed it." *Id.* at 310.

*Espinoza* qualified the general rule that an I–213 is admissible to prove alienage with the caveat that "[a] petitioner who produce[s] probative evidence that contradicts anything material on the I–213 would cast doubt upon its reliability. In that case, the factfinder would be hard put to find the I–213 clear and convincing evidence of alien status without the government's producing evidence to show the reliability of the information on the I–213." *Id.*

In seeking to extend *Espinoza*'s rule to WR–424 Forms, the majority takes two missteps. First, the majority doesn't need to reach the general question whether a WR–424 Form, standing alone, can be used by the INS to prove alienage because the WR–424 *at issue in this case* was generated under circumstances indicating its untrustworthiness. The WR–424 was therefore inadmissible under *Espinoza.* Second, even if the WR–424 in this case were trustworthy and therefore admissible, the INS should not be permitted to use a WR–424, standing alone, to meet its

burden of proving alienage by clear and convincing evidence. I explain each of these objections in turn.

Several circumstances establish the untrustworthiness of the WR–424 bearing Lopez–Chavez's name. As recounted above, the alleged preparer of the WR–424, Epifano Miera, had no recollection of the interview with Lopez–Chavez during which Miera prepared the form. Miera was unable to identify Lopez–Chavez during the deportation hearing, and could only establish that he filled out the form because it was in his handwriting. The WR–424 was not signed, and did not reflect who prepared it. Miera was also unable to recall whether he filled out the form based on answers given to him by Lopez–Chavez, or whether he used a computer printout provided to him by the Orange County Sheriff's Department. The majority is thus incorrect when it asserts that "[t]here was no evidence that the information on the form was obtained ... from anyone other than Lopez–Chavez himself." Maj. Op. at 1181.

Miera interviewed ten people for five minutes each on the day he interviewed Lopez–Chavez. The WR–424 is not intended to be used when individuals are arrested by the police on non-immigration related charges. Its purpose is to obtain preliminary information when an individual is arrested by the INS "in the field" because he or she is a suspected alien. This is why Miera filled out so much of Lopez–Chavez's WR–424 incorrectly: he left out the time and place that Lopez–Chavez was arrested, and also the time that he conducted Lopez–Chavez's interview. Miera also incorrectly indicated that he was the "Apprehending Officer." Miera admitted that Lopez–Chavez never stated that he entered without inspection, and that he could not recall the basis for the "EWI" notation in the "Status at Entry" space on the WR–424.

All of these circumstances, taken together, establish the untrustworthiness of the WR–424 in this case. The majority's conclusion that the WR–424 here "was probably admissible" under Federal Rule of Evidence is incorrect. Maj. Op. at 1181. While the majority is correct that immigration judges are not "bound by the strict rules of evidence at a deportation hearing," Maj. Op. at 1181, we held in *Espinoza* that when a petitioner casts doubt on the reliability of an I–213, the government must introduce evidence to show the document's reliability. *Espinoza,* 45 F.3d at 311. The government did not do that here. The IJ therefore should not have admitted the WR–424 into evidence.

Even if the WR–424 in this case had been prepared under the best of circumstances, and were therefore admissible, I would still hold that a WR–424, standing alone, is insufficient to establish alienage in a "clear and convincing" manner. *See Woodby v. INS,* 385 U.S. 276, 286, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (holding that INS must prove each ground of deportability by "clear, convincing, and unequivocal evidence"). Unlike an I–213, which is entitled, "Record of Deportable Alien," the WR–424 is not an "official" INS form. The WR–424 apparently is used only on a local, rather than on a national basis. The WR–424 is the size of an index card, and does not have spaces for an INS agent to explain, for example, whether an individual is a legal permanent resident, even if he or she entered without inspection. Also unlike an I–213, the WR–424 does not require a signature from its preparer attesting to its veracity and accuracy.

Moreover, as explained above, the WR–424 is not intended to be used when individuals are arrested by the police on non-immigration related charges. Even though the WR–424 is ill suited for any purpose other than interviewing suspected

aliens who are arrested "in the field," the INS instructs its agents to use the WR–424 for "many, many purposes," and not simply—as in the case of the I–213—to create a record of a deportable alien. Given the manner in which the INS employs the WR–424, it cannot be said that the form fits into a scheme of "normal recordkeeping requirements." *Cf. Espinoza,* at 310 (holding that admission of I–213 is "fundamentally fair" when it is completed in accordance with "normal recordkeeping requirements").

A final point is worth making. Our court has held that an I–213 can be used by the INS to meet its burden of proving alienage by clear and convincing evidence. *Espinoza,* 45 F.3d at 311. Given this rule, it seems like the INS will only be forced to resort to the WR–424 when, as in this case, the I–213 does not, for whatever reason, establish alienage by clear and convincing evidence. If the INS cannot use the I–213 to establish alienage, then it is hard to imagine in what circumstances the WR–424—which provides much less information and does not require a signature—could be *more* reliable than the I–213.

Accordingly, I dissent.