**Xu Ming LI; Xin Kui Yu, Petitioners,**

v.

**John ASHCROFT, Attorney General,\* Respondent.**

**No. 00–70157.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 2002.

Filed Dec. 5, 2002.

United States, Fed. R.App. P. 43(c)(2).

Michael P. Karr, Sacramento, CA, for the petitioners.

Greg D. Mack and Russell J.E. Verby, Washington, D.C., for the respondent.

Before: WALLACE, KOZINSKI and PAEZ, Circuit Judges.

Opinion by Judge WALLACE; Partial Concurrence and Partial Dissent by Judge PAEZ.

WALLACE, Senior Circuit Judge.

Xu Ming Li and Xin Kui Yu petition for review of the Board of Immigration Appeals' (Board) decision to deny their applications for asylum and withholding of removal under both 8 U.S.C. § 1231(b)(3)(A) and Article 3 of the United Nations' Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention), opened for signature February 4, 1985, S. Treaty Doc. No. 100–20, at 20 (1988), 23 I.L.M. 1027, 1028

(1984). The Board had jurisdiction under 8 C.F.R. § 3.1(b)(2) and § 240.53. We have jurisdiction over these timely filed petitions under 8 U.S.C. § 1252(a) and 8 C.F.R. § 208.18(e). We deny the petitions.

I.

Xu Ming Li, born on February 26, 1979, was raised in a village within Fu Chow City, Fujian Province, People's Republic of China. After graduating from the Chinese equivalent of junior high school in 1995, she lived at home with her parents, where she helped with household chores.

Xin Kui Yu was raised in the same village as Xu Ming Li. By the time of an August 10, 1999 hearing before the Immigration Judge (IJ), he was twenty-two years old. Xin graduated from the Chinese equivalent of high school at the age of nineteen in 1996. Following graduation he worked as a fisherman.

Xu and Xin met through a mutual friend at a McDonald's restaurant in Fu Chow City on August 1, 1998. They quickly fell in love and began seeing each other on a daily basis. So that she and Xin could spend more time together, Xu moved from her parents' newer five-story house to her parents' older and empty two-and-a-half-story house. Xin often stayed with Xu at the old house until two or three in the morning and rumors began to circulate throughout their small village. On August 15th, a man from the village confronted Xu at the old house. He told her that her relationship with Xin was "shameful" and that she should end it. Xu replied that she "did not believe in the policy," and that it was not fair. She said "this is freedom for being in love.... You should not interfere this .... I'm going to have many babies with my boyfriend ...," and "you have nothing to do with this...." She then

told him to get out. Before leaving, the man warned her to "be careful" and said that she would pay.

Two days later, two nurses from the "Department of Birth Control" came to Xu's house to take her to a medical center for a pregnancy examination. Xu described the incident:

> Two men pressing on my, both of my arms. I was taken to the birth control department of the village. I was put on a bench. Two nurse [sic] came in. They put their hands on my arm, and the doctor came in to examine my private area. I was so scared. I was yelling. I was making noises.... I said you guys are not fair to me. That is no reason to do this to me. Let me go. Let me go. Release me. I was kicking my feet. The family planning person came in and pressed my leg. Stop yelling. If keep on yelling, and in the future you are subject to this kind of test anytime. And if you are found pregnant, then you are subject to abortion, and your boyfriend will also be, will under sterilization operation. For the rest of your life you cannot have child.

The examination lasted approximately half an hour.

On August 25th, Xu and Xin went to the head of the village's Family Planning Department to apply for a marriage certificate. There, Xu learned that the minimum marriage age was twenty for females and twenty-two for males. Xu and Xin were nineteen and twenty-one, respectively. The head of the Family Planning Department sent them to the leader of the village, presumably to seek a waiver, as Xin testified that in certain circumstances the village leader could waive the age requirement. The leader of the village denied their request and sent them on their way.

Shortly thereafter, a neighbor named Lin Shao suggested that Xu and Xin go to the United States and offered to help them in the endeavor. After taking their pictures and collecting information from them, Shao told them he would arrange for them to leave in a week. While Xu and Xin were waiting to hear from Lin, the rumors continued to swirl and the situation became increasingly difficult for them and their families. In an attempt to quell the gossip and harassment, Xu and Xin, with the blessing of their parents, decided to marry despite the age restrictions. They were engaged to be married on October 8th and began preparations on the 10th for the wedding. On either the 10th or the 15th of October, they tried once more to obtain a marriage certificate but were unsuccessful. Wedding invitations were sent out on the 17th for a combined ceremony and banquet that was to be held on the 24th.

On October 19th, a classmate of Xin's (who happened to be a government messenger) told Xin that he had seen a copy of an arrest order for Xin and Xu that was to be carried out the next day. Fearing the worst, Xin and Xu fled to Guang Chi to stay with one of Xin's friends. After Xin and Xu arrived in Guang Chi, they called home and learned that the Security Bureau had indeed come looking for them. Xu and Xin stayed in Guang Chi until Xu's parents arrived on October 31st. The parents took them to Fuzhou and bought them tickets to fly to Dau Lin on November 1st. After arriving in Dao Lin, Xu and Xin took a ship to South Korea.

From Korea, they flew to San Francisco, California on November 5, 1998, where they presented themselves as United States citizens. After being questioned, they admitted that they were citizens of China. The Immigration and Naturalization Service then sought to have them

removed for seeking admission to the United States by fraudulent means in violation of 8 U.S.C. § 1182(a)(6)(C)(i). At a hearing on February 1, 1999, Xu conceded that she was removable but applied for asylum and withholding of removal. The IJ found Xu and Xin's testimony to be credible but concluded that Xu was not eligible for asylum or entitled to withholding of removal under 8 U.S.C. § 1231(b)(3)(A) because she failed to demonstrate that she had been persecuted in China or that she had a well-founded fear of persecution. The IJ further determined that she was not entitled to withholding of removal under Article 3 of the Convention because she failed to prove that she had been tortured. The Board accepted the IJ's decision and dismissed Xu's administrative appeal.

■■■ When the Board adopts the IJ's decision, we treat the IJ's decision and the Board's decision as one and the same. *Gonzalez v. INS*, 82 F.3d 903, 907 (9th Cir.1996). We review factual findings underlying the Board's dismissal of Xu's appeal for substantial evidence. *See Ochave v. INS*, 254 F.3d 859, 861–62 (9th Cir. 2001). This means that we will grant the petition only if the evidence in the record is so strong that it compels a contrary conclusion. 8 U.S.C. § 1252(b)(4)(B); *see also Chen v. INS*, 266 F.3d 1094, 1098 (9th Cir.2001) (citing 8 U.S.C. § 1252(b)(4)(B)). "We review de novo purely legal questions regarding the requirements of the Immigration and Nationality Act ... although the BIA's interpretation of the meaning of the statute is entitled to deference according to the rules of *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." *Ladha v. INS*, 215 F.3d 889, 896 (9th Cir.2000) (internal quotation marks and citation omitted).

## II.

With a few exceptions not relevant here, the Attorney General, in his discretion, may grant asylum to an alien who qualifies as a refugee under 8 U.S.C. § 1101(a)(42)(A). A refugee under section 1101(a)(42)(A) is a person who is "unable or unwilling to return" to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.*

■■■ An alien may also be entitled to withholding of removal. To qualify for withholding of removal under 8 U.S.C. § 1231(b)(3)(A), an alien must establish by a "clear probability" that her "life or freedom would be threatened" upon return because of her "race, religion, nationality, membership in a particular social group, or political opinion." *Navas v. INS*, 217 F.3d 646, 655 (9th Cir.2000); *see also* 8 U.S.C. § 1231(b)(3)(A).

■■■ Withholding of removal's "clear probability" standard is more stringent than asylum's "well-founded fear" standard, in part because withholding of removal is a mandatory form of relief. *Navas*, 217 F.3d at 655. Consequently, "failure to satisfy the lesser standard of proof required to establish eligibility for asylum necessarily results in a failure to demonstrate eligibility for withholding of deportation." *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir.1996) (internal quotation marks omitted). We will therefore first determine whether Xu is eligible for asylum before turning to withholding of removal.

The relationship between China's one-child policy and our asylum laws has stirred some controversy in the last fifteen years. In *In re Chang*, 20 I. & N. Dec. 38, 1989 WL 247513 (B.I.A.1989), the Board

officially determined that a person who was subject to China's one-child policy did not qualify for asylum or withholding of deportation on that basis alone because subjection to the one-child policy, even if it included an act as severe as forced sterilization, would not constitute persecution "*on account of* race, religion, nationality, membership in a particular social group, or political opinion." *Id.* at 46–47 (emphasis added).

The House of Representatives responded to the Board's decision in *Chang* some years later when it held hearings to highlight some of China's population control practices. *Coercive Population Control in China: Hearings Before the Subcomm. on Int'l Operations and Human Rights of the Comm. on Int'l Relations of the House of Representatives*, 104th Cong. (1995). Not long after the hearings, the House drafted language to reverse the *Chang* decision and extend asylum protection to victims of coercive family planning practices in China. That language ultimately became law as section 601 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–208, Div. C, 110 Stat. 3009, 3009–546. Section 601 added a new third sentence to the refugee definition in 8 U.S.C. § 1101(a)(42):

> For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to

have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42). Only 1,000 people may be admitted each year under this new provision. *Id.* § 1157(a)(5).

A handful of decisions have addressed the meaning of the amendment. *In re X–P–T*, 21 I. & N. Dec. 634, 635, 1996 WL 727127 (B.I.A.1996), took the obvious step of acknowledging IIRIRA's reversal of *Chang* when it extended asylum protection to an alien that had been forcibly sterilized under China's one-child policy. In *In re C–Y–Z*, 21 I. & N. Dec. 915, 1997 WL 353222 (B.I.A.1997), the Board extended asylum protection under this provision even further when it concluded that the spouse of a person who had been forcibly sterilized was also eligible for asylum. *See also Zhao v. Reno*, 265 F.3d 83, 95 (2d Cir.2001). The Fourth Circuit in *Chen v. INS*, 195 F.3d 198, 201 (4th Cir.1999), addressed an alien's well-founded fear of being forcibly sterilized upon return to China. To date, the cases have focused on the "involuntary sterilization" portion of the new third sentence. We are the first Circuit to address the meaning of the new third sentence's more opaque "other resistance to a coercive population control program" language.

### A.

■ Xu first argues that she is eligible for asylum and entitled to withholding of deportation because she was persecuted in China for resisting its coercive family planning practices. The first part of the new third sentence in the refugee definition states:

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population con-

trol program, shall be deemed to have been persecuted on account of political opinion ...

8 U.S.C. § 1101(a)(42).

▉ This passage describes four categories of individuals deemed to have been persecuted because of political opinion: 1) those forced to have an abortion, 2) those forcibly sterilized, 3) those persecuted because they failed or refused to undergo 1 or 2, and 4) those persecuted for their "other resistance to a coercive population control program." *Id.* Based on the plain language of the statute, an alien in categories 1 or 2 need not prove persecution, apparently because forced abortion and involuntary sterilization are persecution per se under the new provision. An alien in categories 3 or 4, however, must show that her treatment was also persecutory. Thus, to take advantage of sentence three's "other resistance" clause, Xu must demonstrate that she was 1) persecuted 2) on account of 3) her resistance to 4) a "coercive population control program." *Id.*

Each persecution inquiry is unique and depends to a great extent on the facts of the particular case. *Singh v. INS,* 134 F.3d 962, 967–68 (9th Cir.1998). Yet no case is decided in a vacuum. We have frequently relied on analogous factual settings in past cases to help us decide whether to grant or deny asylum petitions for review. *Id.* Unfortunately, no reported case is quite like this one. As we have pointed out, there are a handful of cases that deal with forced sterilization. Those cases, though, seem to involve a type of suffering that is different in degree and duration.

One of our previous decisions, while not identical to this case, is comparable. *Prasad v. INS,* 47 F.3d 336 (9th Cir.11–1995), is one of a number of cases involving the alleged persecution of Fijians of Indian descent at the hands of ethnic Fijians following a 1987 coup in Fiji. Prasad, a Fijian of Indian descent, was stopped and arrested by ethnic Fijians while he was driving his taxi. He was taken to a police station where he was placed in a cell. *Id.* at 339. While there, he was "hit on his stomach and kicked from behind." *Id.* He was released after somewhere between four and six hours. *Id.* Though in *Prasad* we thought that a reasonable fact-finder could have determined that Prasad's treatment was persecutory, we affirmed the Board because the evidence did not compel such a determination. *Id.* at 340.

Prasad's experience is in some ways comparable to Xu's. Prasad and Xu were both detained by governmental officials and physically mistreated. There are significant differences in Prasad and Xu's experiences, however. Xu's pregnancy examination, for example, is hardly comparable to Prasad being hit and kicked. Further, Prasad was detained for between four and six hours while Xu was detained for only half-an-hour.

▉ While Prasad's experience was not altogether like Xu's, their experiences are sufficiently comparable that we can resolve this case by following the approach used in *Prasad.* Here, the Board could have concluded that Xu was persecuted on the record before it. Yet that record was not so compelling that it required such a conclusion. *See* 8 U.S.C. § 1252(b)(4)(B); *Chen,* 266 F.3d at 1098. We have stated that persecution under the asylum laws does not include every act that our society would deem offensive. *Ghaly v. INS,* 58 F.3d 1425, 1431 (9th Cir.1995). Rather, it includes only those acts which are extreme. *Id.* Substantial evidence supports the Board's decision that Xu's treatment did not constitute persecution as thus understood under the asylum laws. Because Xu has failed to satisfy the persecution

element of the refugee definition's third sentence, we need not decide whether she has satisfied the remaining elements.

Xu also argues that the record compels us to conclude that she was persecuted on account of her membership in a "particular social group." 8 U.S.C. § 1101(a)(42)(A). Because substantial evidence supports the Board's decision that Xu was not persecuted, we have no need to decide this question either.

### B.

■■■■ Xu next argues that she is eligible for asylum because the evidence compels us to conclude that she has a well-founded fear of persecution. Because substantial evidence supports the Board's conclusion that Xu was not persecuted, we will not presume that Xu has a well-founded fear of persecution. *See Navas,* 217 F.3d at 657. Instead, Xu must demonstrate that she has a "subjectively genuine and objectively reasonable" fear of persecution if she returns to China. *Fisher,* 79 F.3d at 960.

> The subjective component may be satisfied by credible testimony that the applicant genuinely fears persecution. The objective component requires a showing by credible, direct, and specific evidence in the record, of facts supporting a reasonable fear of persecution on the relevant ground.

*Id.* (internal quotation marks and citation omitted).

■■■■ The Board concluded that Xu "came to the United States ... to get married and to get a job." Xu and Xin are both now old enough to marry legally in China. Xu has pointed to no evidence which suggests that she will be persecuted upon her return either for her desire to marry legally or for her past resistance to China's marriage laws. Consequently, Xu's fear, assuming it exists, is not objectively reasonable, and the Board's decision that she does not have a well-founded fear of future persecution is supported by substantial evidence.[1]

### C.

Because substantial evidence supports the Board's denial of Xu's asylum application, it also supports the Board's denial of her withholding of deportation application. *Fisher,* 79 F.3d at 961.

### III.

■■■■ Xu also seeks protection under Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention), opened for signature February 4, 1985, S. Treaty Doc. No. 100–20, at 20 (1988), 23 I.L.M. 1027, 1028 (1984). The United States signed the Convention on April 18, 1988, and the Senate ratified it on October 27, 1990. 136 Cong. Rec. S17, 486–501 (daily ed. Oct. 27, 1990). The Convention became binding on the United States in November of 1994 after President Clinton delivered the ratifying documents to the United Nations. U.N. Doc. 571 Leg/SER.E/13.IV.9 (1995); Convention, art. 27(2).

---

1. The dissent argues that "the presumption of a well-founded fear of future persecution cannot be rebutted merely by pointing to changes in an applicant's personal life." We need not determine whether this statement of the law is correct because, as we have stated, Xu does not enjoy a presumption of a well-founded fear of persecution. *See Navas,* 217 F.3d at 657. Moreover, changes in the applicant's personal life have direct bearing on whether the applicant has a "subjectively genuine and objectively reasonable" fear of persecution under *Fisher,* 79 F.3d at 960.

The Foreign Affairs Reform and Restructuring Act of 1998 initiated the implementation of the Convention. Section 2242, Pub.L. No. 105–277, Div. G, 112 Stat. 2681–761 (Oct. 21, 1998) (codified at note to 8 U.S.C. § 1231). It states that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . ." *Id.* It authorizes the appropriate agencies to adopt implementing regulations. *Id.* Those regulations are contained in 8 C.F.R. §§ 208.16 .18. They state that "[p]rotection under the Convention Against Torture will be granted either in the form of withholding of removal or . . . deferral of removal," *Id.* § 208.16(c)(4), and define torture as

any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*Id.* § 208.18(a)(1).

The regulations further state that "[t]orture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment. . . ." *Id.* § 208.18(a)(2). As with a traditional application for withholding of deportation, and unlike asylum's less rigorous "well-founded fear" standard, the applicant must prove that "it is more likely than not that he or she would be tortured if removed" to receive protection under the Convention. *Id.* § 208.16(c)(2).

[T]he Convention's reach is both broader and narrower than that of a claim for asylum or withholding of deportation: coverage is broader because a petitioner need not show that he or she would be tortured "on account of" a protected ground; it is narrower, however, because the petitioner must show that it is "more likely than not" that he or she will be tortured, and not simply persecuted upon removal to a given country.

*Kamalthas v. INS,* 251 F.3d 1279, 1283 (9th Cir.2001).

The Board accepted the IJ's conclusion that Xu had not been subjected to an "extreme form of cruel, inhuman treatment" because, at most, she had been forcibly examined. It is possible that the IJ believed that an applicant is entitled to protection under the Convention on the basis of past torture alone. This would be error because protection under the Convention extends only to cases involving a likelihood of future torture. 8 C.F.R. § 208.16(c)(4). Because nearly all of the evidence presented to the IJ went to Xu's past treatment, we will assume that the IJ followed the regulations by considering evidence of past torture to determine the likelihood that she would be tortured if she returned to China. *Id.* § 208.16(c)(3)(i). While one may condemn the way Xu was treated as inconsistent with human rights, we cannot say that the record compels us to conclude that her treatment was an "extreme form of cruel and inhuman treatment," or that she would likely face such extreme treatment upon her return. *Id.* § 208.18(a)(2). The Board's conclusion that Xu was not entitled to withholding of deportation under the Convention is supported by substantial evidence.

## IV.

Finally, Xu contends that the IJ made a number of procedural, factual, and legal errors. With respect to procedure, Xu argues that the IJ erred when he 1) failed to limit the cross-examination of Xin's brother to matters addressed during his direct examination and 2) failed to admit documentary evidence. Proceedings before the IJ, however, are not bound by strict evidentiary rules. *Lopez–Chavez v. INS*, 259 F.3d 1176, 1181 (9th Cir.2001). Instead, the proceedings must be consistent with the requirements of due process. *Id.* Xu cites no authority, and we are aware of none, which suggests that the IJ's decisions on these evidentiary questions violated Xu's right to due process. Her evidentiary arguments are therefore of no matter.

Xu also argues that the IJ erred when it cut her case short and when it relied on certain factual errors. Unfortunately, Xu has not cited authority for these arguments, nor has she explained why they justify our intervention. Consequently, we deem these arguments waived. *See FDIC v. Garner*, 126 F.3d 1138, 1145 (9th Cir.1997).

Xu finally contends that the IJ failed to apply the new "coercive population control" portion of the refugee definition. Not so. The IJ determined that the "coercive population control" portion of the refugee definition was not "controll[ing]" because Xu's treatment did not rise to the level of past persecution.

Xin's petition is denied for the same reasons we deny Xu's petition.

Petitions DENIED.

PAEZ, Circuit Judge, concurring in part and dissenting in part.

As noted by the majority, we are the first circuit to consider the meaning of the clause "other resistance to a coercive population control program" in section 601 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), 8 U.S.C. § 1101(a)(42). Because Petitioner Xu Ming Li ("Li") resisted when Chinese officials forcibly examined her "private parts" to determine whether she was pregnant and threatened her with forced abortion and sterilization, I am compelled to conclude that she qualifies for asylum under section 601, and therefore respectfully dissent from the majority's opinion as it relates to Li. I concur however with the majority's conclusion regarding Xin Kui Yu ("Yu"), but for different reasons.

### I. Li's Petition

#### A. Asylum

To be eligible for asylum under section 601, an applicant who has not been forced to abort a pregnancy or to undergo involuntary sterilization, but who has resisted a coercive population control program, must establish persecution or a well-founded fear of persecution on account of such resistance. Once established, however, such persecution is deemed to be on account of political opinion. As the majority points out, Li must therefore show she (1) was persecuted (2) on account of (3) her resistance (4) to a coercive population control program.

#### 1. Past Persecution

Li was clearly a victim of past persecution. We have defined persecution as "the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive." *Prasad v. INS*, 47 F.3d 336, 339 (9th Cir. 1995). Li was taken by force to the family planning clinic in her village by local family planning officials. The officials hauled

her into an examination room, forced her to lie down on a bench, and two men held her down by the arms. Li kicked, she yelled in fear, and she cried out for help. Despite her resistance, she was forcibly subjected to an examination to detect whether she was pregnant. She was never asked to give a urine sample, but instead was forced to accept an invasive, physical examination of her "private parts." When she protested, one of the family planning officials responded by pressing on her leg and threatening her with future physically-invasive examinations and forced sterilization.

The majority relies on *Prasad* in concluding that although a reasonable fact finder could have determined that Li was persecuted, the record did not compel that conclusion. Although acknowledging that there are "significant differences" between the incidents in *Prasad* and Li's experience, the majority suggests that Li's ordeal was less compelling, stating that "Li's pregnancy examination . . . is hardly comparable to Prasad being hit and kicked." To the extent this statement can be taken to mean that Prasad's experience of being hit in the stomach and kicked from behind one time was more severe than Li's experience, I can only assume that the basis for this conclusion is the majority's characterization of what Li was subjected to at the hands of the local officials as a routine "pregnancy examination" and no more. I simply cannot agree with this characterization of Li's ordeal.

The majority's description of what happened, calling Li's experience a "pregnancy examination," disregards the amount of force to which Li was subjected. Two men pinned Li down on a bench. She screamed to be released as the doctor

physically examined her "private parts" to determine if she was pregnant. In this context, what the majority calls a "pregnancy examination" involved forced submission to a physically invasive procedure. This forced submission clearly establishes harm beyond anything one would expect from a routine "pregnancy examination."

The majority next attempts to compare the length of time for which each was detained, noting that Prasad was "detained for between four and six hours while Li was detained for only half-an-hour." The problem with this approach is that the length of time that one is detained is not a determinative basis for finding persecution. *See Prasad,* 47 F.3d at 341 (Pregerson, dissenting). Rather, the more telling comparison that should be made involves the extent of harm that each endured. Although I recognize that the factual circumstances confronting Prasad and Li were distinct, the physical pregnancy examination that Li was forced to endure was so qualitatively different that the comparison is of little value in determining whether Li was subjected to persecution.

In stark contrast to the majority's description of her experience, Li uses a more forceful characterization to describe her ordeal. She calls it rape-like. This is understandable in light of Li's refusal to consent, the way family planning officials held her down, and the doctor's physically invasive examination of her "private parts" as opposed to a less offensive urine or blood test. Because rape is commonly defined as nonconsensual sexual conduct involving penetration committed by physical force,[1] the analogy does provide some insight into her subjective experience. Although Li does not elaborate on the proce-

---

1. *See* Samuel H. Pillsbury, *Crimes Against the Heart: Recognizing the Wrongs of Forced Sex,* 35 LOY. L.A. L. REV. 845, 859 (2002).

dures used,[2] this comparison graphically conveys the nature of her ordeal and the harm she suffered when she was forced to endure a physical pregnancy examination. Indeed, her experience shares several aspects of the experience of a rape victim, including the intrusion into her body, the forced physical submission, and the feelings of fear and humiliation. Even so, it is not necessary to rely on our asylum rape cases, *see e.g. Shoafera v. INS*, 228 F.3d 1070 (9th Cir.2000), to conclude that Li suffered persecution when she was forced to endure a pregnancy examination by local family planning officials.

Ultimately, we must assess all aspects of the harm suffered by an individual asylum applicant. Here, the forced examination, the invasive nature of the examination, Li's resistance and the threats of future forced pregnancy examinations, abortions and sterilization compel the conclusion that Li suffered persecution by local Chinese officials.

### 2. Coercive Population Control Program

Although the majority does not address whether Li's forced examination was on account of her resistance to a coercive population control program, the uncontested evidence at Li's asylum hearing established the remaining elements of section 601. With regard to the coercive population control program, the former deputy mayor of the city in which Li lived testified

as follows regarding the family planning policies governing couples who live together before they reach the age of marriage:

Q: If you know, Mr. Lin, what are the consequences assigned to people who marry after their marriage license has been denied, who have gotten married in defiance?

A: Well the consequences is serious.

Q: Can you elaborate a little?

A: That was consider early age marriage. That was a violation of the family planning policy. These people will be (indiscernible) physically examined every three months to see if the woman is pregnant ... Now if a woman is found pregnant, she was subject to the operation of abortion immediately.

Q: Yeah. But let me ask you the question. What we want to know is that if somebody, if a couple, after their application for marriage certificate is denied, if a couple decide to go ahead and live together as husband and wife, what does the law provide for that kind of violation or infraction in China?

A: Whatever (indiscernible) reason of the family planning policy.

Q: Yeah. The woman would be asked to report for pregnancy test every three months. Is that right? That's what you say?

A: Yes.

---

**2.** The record does not document the procedures used by doctors in Li's village, but the record does establish that Li was subjected to a physical pregnancy examination without the benefit of a urine or blood test. Aside from measuring levels of chorionic gonadotropin (hCG) in a woman's blood or urine, the only other means of diagnosing pregnancy before 17 weeks are to identify the presence of changes or signs and symptoms in the uterus, the cervix, and the vaginal mucosa. *See* WILLIAMS OBSTETRICS 22–34 (F. Gary Cunningham ed., 20th ed.1997). The cervix

is the opening to the uterus and it sits at the end of the vaginal canal inside the woman's body. *Id.* at 41, 46–47. Therefore, without a urine or blood sample, one method of physically diagnosing pregnancy and detecting the changes in the uterus and cervix is "with one hand of the examiner on the abdomen and two fingers of the other hand placed in the vagina, the still-firm cervix is felt, with the elastic body of the uterus above the compressible soft isthmus, which is between the two." *Id.* at 25.

Q: What if the pregnancy test is negative, but they are underage, still underage?

A: Well even though the test was negative, the local authority is responsible to educate the couple.

Q: Right. So there would be mandatory education, pregnancy testing.

This is consistent with Li's testimony regarding the events leading up to her forced examination.

### 3. On Account Of

Further, the evidence before the IJ established that Li was subjected to the forced examination *on account of* her attempts to resist the policy. Li testified that people in her village believed that she was living with her boyfriend, a fact which in and of itself gave rise to the possibility of an unauthorized pregnancy. The villagers further "informed" local officials that she was pregnant. Then, when the village representative came to her house and told her to end her relationship, she stated her intention to have many children with her boyfriend. He told her that she "would pay," and just two days after this confrontation, family planning officials forced her to undergo a physical examination to determine if she was pregnant. In light of the population control policy, her defiant statements, and the subsequent forced examination, the undisputed evidence shows that Li was subjected to the family planning policies described by the former deputy mayor.

### 4. Resistance

The record also demonstrates that Li resisted the policy itself and its enforcement. First, she resisted by telling the village representative that she did not believe in the policy and that he should not interfere. We have held that statements and perceived associations can constitute resistance for asylum purposes. *See Desir v. Ilchert*, 840 F.2d 723, 727–28 (9th Cir. 1988) (holding that refusal to pay money to corrupt quasi-government forces constituted resistance and basis for persecution); *Ventura v. INS*, 264 F.3d 1150 (9th Cir. 2001) (stating that family members' involvement in military was the basis for guerilla forces believing petitioner was resisting their recruitment efforts), *rev'd on other grounds*, —— U.S. ——, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002). Further, as the majority notes, Li testified as follows regarding her resistance to the physically invasive examination to determine whether she was pregnant:

A: I was yelling. I refused to be inspect[ed].

Q: So you refused the pregnancy test, right?

A: Of course. I am still unmarried. I'm still a girl.

Q: Let me ask you. Did they take a urine sample?

A: I was so nervous. No. I have not. Doctor came in to examine my private area.

Q: All right.

. . .

Q: Did you, did you shout for help when this was happening?

A: Yes.

Q: What did you say?

A: I said you guys are not fair to me. That is no reason to do this to me. Let me go. Let me go. Release me. I was kicking my feet. The family planning person came in and pressed my leg. Stop yelling. If keep on yelling, and in the future you are subject to this kind of test anytime. And if you are found pregnant, you are subject to abortion, and your boyfriend will also be, will under sterilization operation. For the rest of your life you cannot have a child.

Li's testimony established that she resisted both the policy and the local birth control officials' decision to subject her to a physical examination to determine whether she was pregnant. She was forced to endure an invasive examination despite both her verbal and physical protests and her refusal to submit voluntarily to the examination. Because Li was persecuted on account of her resistance to a coercive population control program, she meets the statutory definition of a "refugee" under section 601.

Once we determine that an alien has suffered past persecution, this conclusion triggers a regulatory presumption that the alien has a well-founded fear of future persecution. This presumption provisionally establishes the alien's refugee status and eligibility for asylum. 8 C.F.R. 208.13(b)(1)(i); *Popova v. INS*, 273 F.3d 1251, 1259 (9th Cir.2001). This presumption "may be overcome by evidence that 'since the time the [past] persecution occurred, conditions in [the country of petitioner's nationality] have changed to such an extent that [petitioner] no longer has a well-founded fear of being persecuted if [s]he were to return'" to her home country. *Meza–Manay v. INS*, 139 F.3d 759, 766 (9th Cir.1997) (quoting *Prasad v. INS*, 101 F.3d 614, 616 (9th Cir.1996)) (alteration in original). Li was persecuted because of her resistance to China's coercive population control policy. She resisted a forced, physical pregnancy examination administered after village members informed local family planning officials that she was living with her boyfriend underage and out of wedlock, and she was threatened with future examinations as a consequence of her resistance. The INS failed to present any evidence that her resistance to China's coercive population control policy would go unpunished once she reached a certain age, nor did it present any evidence that the population control policy has changed.

The majority concludes that because Li's personal circumstances have changed—she is now of legal age to marry—she no longer has a basis to fear future persecution. This conclusion is unfounded, however, because the presumption of a well-founded fear of future persecution cannot be rebutted merely by pointing to changes in an applicant's personal life. *Meza–Manay*, 139 F.3d at 765–66 (holding that where the only evidence offered to rebut the presumption was that petitioner was no longer married to her police-force-member husband, the INS failed to prove changed country conditions); 8 C.F.R. 208.13(b)(1)(i). Because the INS did not present any evidence of changed country conditions at Li's asylum hearing, it has not rebutted this presumption. I would, therefore, conclude that Li has demonstrated statutory eligibility for asylum and grant her petition.

## B. Withholding of Removal

Further, because Li has established that her freedom was threatened in China and the INS has done nothing to rebut the presumption of her well-founded fear of persecution should she return, I would also conclude that she is entitled to withholding of removal. Withholding of removal is mandatory if an "alien's life or freedom would be threatened[in the country of origin] on account of race, religion, ... or political opinion." 8 U.S.C. § 1231(b)(3)(A). Although the standard is more rigorous than the well-founded fear standard for granting asylum, *compare INS v. Stevic*, 467 U.S. 407, 424, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984) *with INS v. Cardoza–Fonseca*, 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), a "determination of past persecution such that a petitioner's life or freedom is threatened creates a presumption of entitlement to withholding" of removal. *Rios v. Ashcroft*,

287 F.3d 895, 903 (9th Cir.2002) (quoting *Ventura,* 264 F.3d at 1154). Because the INS failed to present any evidence of changed country conditions, it is "more likely than not that [Li] would be subject to persecution." *Stevic,* 467 U.S. at 424, 104 S.Ct. 2489. I would therefore also conclude that Li is entitled to withholding of removal.[3]

### II. Yu's Petition

I agree with the majority's conclusion that Yu is not eligible for asylum and that he is not entitled to withholding of deportation under both 8 U.S.C. § 1231(b)(3)(A) and Article 3 of the United Nations' Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment, but for different reasons. Although Yu likely could claim imputed persecution if he had married Li, *see In re C–Y–Z,* 21 I & N Dec. 915 (1997), the record reflects that Yu and Li never married. The facts here do not warrant imputing Li's persecution under section 601 to Yu. Considering his petition on its own merits, I would deny Yu's petition because the only persecution he can claim with respect to his resistance to a coercive population control program is the threat of forced sterilization that the family planning official made during Li's forced pregnancy examination. Because Yu was not present at that examination and was never confronted by family planning officials, this threat of possible future sterilization does not rise to the level of persecution. *See Lim v. INS,* 224 F.3d 929, 936 (9th Cir. 2000) (finding no past persecution where Lim received death threats in the mail and by phone, but was never even closely confronted or otherwise harmed). On the rec-

ord here, I agree with the majority's conclusion that his petition should be denied.

---

**3.** Because I would grant Li's petition with respect to asylum and withholding of removal, it is not necessary to address Li's claim for withholding of removal and/or deferral of removal under the Article 3 of the United Na-

tions' Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, opened for signature February 4, 1985, S. Treaty Doc. No. 100–20, at 20 (1988), 23 I.L.M. 1027, 1028 (1984).