**Li Chen ZHENG, aka Zheng Li Chen, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 02–70193.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 7, 2003.

Filed June 18, 2003.

Jisheng Li, Honolulu, HI, for the petitioner.

Norah Ascoli Schwarz, Office of Immigration Litigation, U.S. Department of Justice, Washington, DC, for the respondent.

Before BROWNING, PREGERSON, and REINHARDT, Circuit Judges.

## OPINION

PREGERSON, Circuit Judge.

Li Chen Zheng ("Zheng"), a Chinese native and citizen, petitions this court for review of the Board of Immigration Appeals' ("BIA") final order. The BIA vacated the Immigration Judge's ("IJ") decision granting Zheng's application for relief under Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture" or "Convention")[1] and ordered Zheng removed to China. Under the Convention Against Torture, the United States will not "expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub.L. No. 105–277, Div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as note to 8 U.S.C.A. § 1231 (1999)).[2] To qualify for relief under the Convention, the torture must be "inflicted by or at the instigation of or with the consent or *acquiescence* of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1) (emphasis added). Zheng believes that if he is returned to China he will be killed by the smugglers who brought him to the United States because he reported the names of the smugglers to the American government; Zheng contends that the Chinese government will not protect him because public officials are connected to the smugglers. The IJ found that Zheng had "established a clear probability of torture and that there is [a] sufficient nexus between the [Chinese] public officials" and the smugglers; thus, the IJ granted Zheng relief under the Convention. But the BIA vacated the IJ's decision. Relying upon its previous decision in *Matter of S–V–*,[3] the BIA ruled that Zheng had to demonstrate that government officials "are willfully accepting of" the torturous activities of a third party. The BIA determined that—even assuming government officials were involved with smuggling—Zheng failed to show that Chinese officials would acquiesce to the torture inflicted by the smugglers.

We conclude that the BIA's interpretation of *acquiescence* to require that government officials "are willfully accepting"

---

1. United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 23 I.L.M. 1027, 1465 U.N.T.S. 85.

2. We have jurisdiction under section 2242(d) of FARRA, the Convention Against Torture's implementing legislation. *See also* 8 C.F.R. § 208.18(e) ("Judicial review of claims for protection from removal under Article 3 of the Convention Against Torture.").

3. 22 I. & N. Dec. 1306 (BIA 2000) (en banc).

of torture to their citizens by a third party is contrary to clearly expressed congressional intent to require only "awareness," and not to require "actual knowledge" or "willful[ ] accept[ance]" in the definition of acquiescence. Therefore, we grant Zheng's petition, vacate the BIA's decision, and remand to the BIA for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual and Procedural History [4]

Zheng was born on February 19, 1983, in the Fujian Province in the People's Republic of China. In 1991 or 1992, his father left China to come to the United States; his father now lives in New York. In 1997, Zheng's mother left China to come to the United States; his mother now lives in Guam. On April 9, 1999, Zheng left China to come to the United States. He was 16 years old.

Zheng left China because he "was in a very low position." His parents had violated China's birth control policy. Under China's policy, if the "first born is a boy, you cannot have a second child"; Zheng's parents had two daughters after Zheng was born.

Human smugglers who transport Chinese immigrants from China to the United States and other countries—known as "snakeheads" [5] or "seaman"—brought Zheng, along with approximately one-hundred and fifty Chinese nationals, into the United States on a large boat. On or about April 23, 1999, Zheng was apprehended seeking to enter Guam. In the custody of the United States Marshal, Zheng lived on Tinian Island until June 1999.

While on Tinian Island, Zheng was a material witness in a criminal proceeding against the smugglers and "reported all the names of the seamen and said that they tortured me, tortured us." The same evening that Zheng reported the names of his smugglers, a snakehead nicknamed Lu Son approached Zheng as he waited for

4. The facts described below are taken from Zheng's testimony before the IJ. Because the IJ found Zheng's testimony credible, and the BIA did not make a contrary finding, we accept the facts given by Zheng and the reasonable inferences to be drawn therefrom as true. *See Rios v. Ashcroft,* 287 F.3d 895, 898 n. 1 (9th Cir.2002); *Ladha v. INS,* 215 F.3d 889, 900 (9th Cir.2000) ("[W]hen an alien credibly testifies to certain facts, those facts are deemed true, and the question remaining to be answered becomes whether these facts, and their reasonable inferences, satisfy the elements of the claim for relief."). We reject as without merit the INS's argument that the IJ's inferences from the facts were not reasonable, and therefore reject the INS's argument that "there are several evidentiary gaps which petitioner failed to close."

5. We recently recounted the testimony of Dean G. Rojek, an associate professor of sociology at the University of Georgia: Professor Rojek testified on behalf of Jian Chen, a Chinese national also smuggled into the United States by "snakeheads." *Chen v. Ashcroft,* 289 F.3d 1113, 1114 (9th Cir.2002), *vacated on other grounds by Chen v. Ashcroft,* 314 F.3d 995 (9th Cir.2002). Professor Rojek has written extensively on the methods of social control practiced by the government of the People's Republic of China ("PRC"), and has lectured four times in China at the invitation of the government's Ministry of Justice. *Id.*

Rojek testified that the snakeheads were, "an enormous organization," "very, very pervasive," and "very, very powerful." Those who failed to pay debts owed to the snakeheads would have to pay "the ultimate price," by facing "torture" involving "dismemberment of some sorts or other" and even death. Rojek testified that ... the PRC would not protect [Chen] from the snakeheads because the existence of the snakeheads as a criminal syndicate was not acknowledged by the PRC. "To intercede" for Jian Chen would be to admit their existence and so "to lose face," which "the Chinese government simply is not going to do...."

*Id.*

the restroom. Zheng testified that the snakehead told him "you be careful, you [will] be dead for sure." Zheng thought that the snakehead was going to "beat me." But a "police officer using [a] flashlight" came by and the snakehead left. Zheng told "an adult" about the snakehead's death threat. The adult told Zheng "this is not a big problem. Since we are here in the United States the American Government will protect us. We become their witnesses and they will be responsible for us." Zheng stated that "[a]fter I heard this, I did not report" the snakehead's threat.

On June 17, 1999, Zheng was transferred to a juvenile detention center in Guam. Zheng stated that in Guam, he was "allowed to write a letter [to his parents], but I was not allowed to call. One letter only.... I cried and ask[ed] to call them, but ... it was refused." When Zheng asked why he was not allowed to contact his parents "[the officers] said, one of them said because we were witness[es], we were under protection."

In March 2000, Zheng was flown to Los Angeles, California. On April 5, 2000, Zheng first appeared before the Immigration Judge in Los Angeles for removal proceedings.

On May 10, 2000, Zheng again appeared before the IJ. When asked why he was afraid to return to China, Zheng testified, through an interpreter, that "the smugglers they will hurt me ... [b]ecause I [have] been testifying." In addition, Zheng testified that because his family had violated the one child policy, the Chinese government "will not allow me to further my studies. Whatever school, I tried to apply to, they will expel me." The IJ completed an asylum application for Zheng.

On May 31, 2000, Zheng appeared before the IJ and testified concerning the "very low position" of his family because

his parents had violated the birth control policy. If returned to China, Zheng stated that the government would not allow him to go to school because his family had violated the birth control policy of the government and "[s]econdly [he] was smuggled from China."

Zheng also testified that while still in China, before leaving by boat for the United States, "I was beaten ... [by][t]he snakehead. The one who watched over us ... unintentionally I step[ped] on his foot and he beat me up.... He struck my abdomen and kicked me and asked me to kneel down on the ground and I was not allowed to block with my arm." When asked why he was afraid of being sent back to China, Zheng stated that "[t]he snakehead will kill me ... [b]ecause I am a witness for the American Government against them.... I reported all the names of the seaman and said that they tortured me, tortured us.... I am afraid that the snakehead will kill me." Zheng told the IJ of the snakehead's threat "you be careful, you [will] be dead for sure."

Zheng testified that there was "[n]o way" the Chinese government would protect him from the snakeheads "[b]ecause snakeheads are connected with the Chinese government officials." As an example of the collusion between the government officials and the snakeheads, Zheng testified that he saw the snakeheads give three cartons of cigarettes to the police at the harbor before they were allowed to board the boat.

The IJ admitted the following into the record: declarations of Wu Ming He and Qing He, Chinese immigrants also smuggled into the United States by snakeheads, the United States Department of State Country Report for China dated April 14, 1998, and the Trafficking Victims Protection Act of 2000 ("TVPA"), H.R. 3244, 106th Cong. (1999), which became the

Trafficking Victims Protection Act, Pub. Law 106–386, 114 Stat. 1464 (2000) (codified at 22 U.S.C. §§ 7101–7110). The declaration of Wu Ming He stated that: "It is my personal knowledge that alien smugglers have connections with local government officials. I saw with my own eyes at least four times alien smugglers feasting and patronizing night clubs with local police officers in Fujian." The declaration of Qing He stated that: "I was smuggled into the United States from the Fujian Province of China on a boat. On my way to Guam, I saw with my own very eyes one of my fellow smugglees being tortured by the smugglers."

The State Department Country Report for China states that "China appears to be taking active measures to target people smugglers and stop illegal departures by economic migrants. Several scores of people smugglers and Fujian officials reportedly have been convicted, fired from jobs, or expelled from the Communist Party." Zheng argued before the IJ that this report indicated that there was official participation in alien smuggling in Fujian, the province Zheng is from.

In passing the TVPA, Congress found, in relevant part, that "[t]rafficking often is aided by official corruption in countries of origin[;] ... enforcement against traffickers is also hindered by official indifference, by corruption, and sometimes even by active official participation in trafficking." 22 U.S.C. §§ 7101(b)(8) & (16). In addition, Congress found that traffickers often resort to violence and torture, or threats of violence and torture, to keep their victims in line. 22 U.S.C. §§ 7101(b)(6) & (7). The INS unsuccessfully objected to the admission of the TVPA.

Before stating her decision, the IJ found that Zheng "testified credibly and consistently throughout his entire hearing. ... Therefore, I find that the respondent is credible." The IJ, however, ruled that Zheng "failed to establish the standard for asylum ... [and] failed to establish the standard for withholding of deportation."

After ruling that Zheng was ineligible for asylum, the IJ stated that "[t]he Court is more concerned with the respondent's request for protection under the Convention Against Torture." The IJ found that:

The observations of the respondent where police surrounded the home where he was being detained and then, withdrew after being spoken to by smugglers. Furthermore, the journey along the highway where he was not questioned in the truck where he was traveling in, though other trucks and vehicles were stopped. Then, his final observation of smugglers giving cigarettes to the police and then, the respondent and others being allowed to board the ship, is some evidence of collusion between the government. If not collusion as to the violence, at least some collusion that the government condones or at least is not willing to interfere and, in a way, acquiesces to the smuggler's conduct.

The IJ concluded:

This Court is very concerned with smuggling. The Government of the United States is very concerned with smuggling. I believe that the respondent has established a clear probability of torture and that there is [a] sufficient nexus between the public officials and therefore, his application for protection under the Convention [ ] will be granted.

Zheng did not appeal the denial of asylum or withholding of removal. But the INS appealed the portion of the IJ's ruling that granted Zheng withholding of removal to China under the Convention Against Torture. The issue presented to the BIA was "[w]hether the Respondent failed to demonstrate acquiescence of a public official or other person acting in an official

capacity as required by 8 C.F.R. 208.18," (emphasis omitted). According to the INS, "[t]he main flaw in the[Immigration] Judge's analysis was her failure to recognize the **qualitative** difference between localized government corruption in regard to day-to-day smuggling operations, and *prior* and *knowing* government acquiescence in regard to murder or other violent crimes," (emphases in original). The INS argued that the Chinese government turning a blind eye to its citizens being smuggled out of the country was not tantamount to acquiescing to torture:

> Even if some Chinese police take bribes to let refugees pass through checkpoints, this is a purely non-violent and relatively benign offense[.] It does not raise any inference whatsoever that such bribe-takers would be amenable to violence; i.e., that with *prior knowledge* they would allow the commission of acts of . . . torture,

(emphasis in original).

The BIA sustained the INS's appeal: "The Service contends that the Immigration Judge's decision misapplied the law. We agree." Citing an en banc BIA opinion, the BIA stated that "[w]hen the alien alleges a likelihood of torture from nongovernmental sources, he or she must demonstrate that government officials 'are willfully accepting of' the non-governmental source's 'torturous activities.' *See Matter of S–V–*, Interim Decision 3430, 2000 WL 562836 at 8 (BIA 2000)." The BIA found that, even assuming Chinese government officials knew about the smuggling operations and failed to stop them, Zheng did not show that government officials would acquiesce in harm that rises to the level of torture. The BIA vacated the IJ's decision that granted Zheng's application for withholding of removal pursuant to the Convention and ordered Zheng removed to China.

Zheng now seeks review of the final order of the BIA vacating the IJ's grant of relief under the Convention Against Torture.

## B. The Convention Against Torture

The United Nations drafted the Convention Against Torture in an effort to "make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world." Convention Against Torture, Preamble, 23 I.L.M. at 1027. On December 10, 1984, the United Nations General Assembly adopted the Convention by unanimous agreement. *Committee on Foreign Relations, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, S. Exec. Rep. 101–30, at 2 (1990). President Reagan signed the Convention on April 18, 1988. *Id.* One month later, the President transmitted to the Senate the Convention for approval with nineteen proposed United States conditions, many of which concerned the human rights community, American Bar Association, and other groups. *Id.;* 136 Cong. Rec. 36,193 (1990) (statement of Sen. Pell). One of those conditions was an understanding that the United States interpreted the term *acquiescence* to "require[ ] that the public official, prior to the activity constituting torture, have *knowledge* of such activity." S. Exec. Rep. 101–30, at 15 (emphasis added). According to the Senate Foreign Relations Committee, "[t]hose conditions, in number and substance, created the impression that the United States was not serious in its commitment to end torture worldwide." *Id.* at 4. In January 1990, the Bush administration submitted a revised and reduced list of proposed United States conditions on the Convention: "the conditions proposed . . . in large measure eliminate[d] th[e] problem" that the United States appeared insincere in its commit-

ment to end torture worldwide. *Id.* at 2, 4. Under one of the new proposed understandings, the United States no longer required a public official to have "knowledge of [torture]" to acquiesce to torture; rather the public official need only an "awareness" of torture. *Id.* at 9, 30. The Committee stated that the purpose of requiring awareness, and not knowledge, "is to make it clear that both actual knowledge and 'willful blindness' fall within the definition of the term 'acquiescence.'" *Id.* at 9. In recommending ratification of the Convention with the new conditions, including the understanding that acquiescence required only awareness and not actual knowledge, the Committee found that "[r]atification is a natural follow-on to the active role that the United States played in the negotiating process for the Convention and is consistent with longstanding U.S. efforts to promote and protect basic human rights and fundamental freedoms throughout the world." *Id.* at 3.[6] The Senate adopted its resolution of advice and consent to ratification on October 27, 1990. 136 Cong. Rec. 36,198 (1990). On October 21, 1994, President Clinton deposited the instrument of ratification with the United Nations, and the Convention Against Torture was entered into force for the United States thirty days later. *See* Regulations Concerning the Convention Against Torture, 64 Fed.Reg. 8478 (1999).

In 1998, Congress passed the Foreign Affairs Reform and Restructuring Act of 1998, implementing Article 3 of the Convention Against Torture.[7] FARRA § 2242, 8 U.S.C.A. § 1231, note. This implementing legislation states that it is "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." *Id.,* § 2242(a). FARRA instructed "heads of the appropriate agencies [to] prescribe regulations to implement the obligations of the United States under Article 3 of the [Convention], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." *Id.,* § 2242(b). The INS's regulations to implement Article 3 are found in 8 C.F.R. §§ 208.16–208.18.

## II. STANDARD OF REVIEW

 Because the BIA conducted an independent review of the IJ's findings, we review the BIA's decision and not that of the IJ. *Sidhu v. INS,* 220 F.3d 1085, 1088 (9th Cir.2000). We review for substantial evidence the factual findings underlying the BIA's determination that Zheng was not eligible for relief under the Convention Against Torture. *See Kamalthas v. INS,* 251 F.3d 1279, 1281 (9th Cir.2001); *see also Li v. Ashcroft,* 312 F.3d 1094, 1103 (9th Cir.2002).

 We review de novo the BIA's interpretation of purely legal questions. *See Murillo–Espinoza v. INS,* 261 F.3d

---

**6.** Before the Senate voted to adopt its advice and consent to ratification of the Convention, Senator Moynihan stated:

> The United States has invested enormous resources in this convention. For 7 years our diplomats labored to make the convention more than just words on paper. They made its obligation concrete, meaningful, and, as never before, enforceable. I believe that this is an important step in the continuing battle to end man's inhumanity to man.

136 Cong. Rec. 36,196 (1990).

**7.** Article 3 of the Convention provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that the person would be in danger of being subjected to torture." Convention Against Torture, art. 3, 23 I.L.M. at 1028.

771, 773 (9th Cir.2001). The BIA's interpretations and applications of immigration law, however, are "subject to established principles of deference." *Id.* But deference is not required when the intent of Congress is clear. *Beltran–Tirado v. INS,* 213 F.3d 1179, 1185 (9th Cir.2000); *see also Murillo–Espinoza,* 261 F.3d at 773 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.") (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

## III. DISCUSSION

■ The outcome of this case hinges on the interpretation of the term *acquiescence* as used in 8 C.F.R. § 208.18. To qualify for relief under the Convention Against Torture, Zheng must establish that it is more likely than not that if removed to China, the snakeheads would torture him and that the torture would be inflicted with the *acquiescence* of Chinese government officials. The Convention does not require, as the INS purports, the government to *"knowingly* acquiesce" to such torture. And contrary to the BIA's ruling, the Convention does not require that Zheng prove that Chinese government officials would be "willfully accepting of" the torture inflicted on Zheng by the smugglers. As explained below, Congress made its intent clear that actual knowledge, or willful acceptance, is not required for a government to "acquiesce" to the torture of its citizens. Rather, subject to the understanding contained in the Senate's ratification of the Convention, "[a]cquiescence of a public official requires that the public official, prior to the activity constituting torture, have *awareness* of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7) (emphasis added).

We conclude that the BIA's interpretation of the term *acquiescence* to require that Zheng must prove that the government is "willfully accepting of" torture, instead of proving that public officials are aware of the torture, impermissibly narrows Congress' clear intent in implementing relief under the Convention Against Torture.

■ Under INS regulations, Zheng has the burden of proof "to establish that it is more likely than not that he ... would be tortured if removed" to China. *Al–Saher v. INS,* 268 F.3d 1143, 1147 (9th Cir.2001) (alteration in original) (quoting 8 C.F.R. § 208.16(c)(2)). The regulations define torture as:

> any act by which severe pain or suffering ... is intentionally inflicted on a person for such purposes as ... punishing him or her for an act he or she or a third person has committed ... when such pain or suffering is inflicted by or at the instigation of or with the consent or *acquiescence* of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1) (emphasis added). As stated above, "[a]cquiescence of a public official requires that the public official, prior to the activity constituting torture, have *awareness* of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7) (emphasis added).

Thus, to qualify for relief under the Convention, Zheng has to prove that the torture inflicted by the snakeheads would be carried out with the awareness of the Chinese government officials. That awareness includes "both actual knowledge and 'willful blindness.'" S. Exec. Rep. 101–30, at 9; *see also Ontunez–Tursios v. Ashcroft,* 303 F.3d 341, 354–55 (5th Cir. 2002) (stating that "'[w]illful blindness' suffices to prove 'acquiescence'" and finding that the evidence presented did not show that Honduran public officials "would

turn a blind eye to torture"); *Ali v. Reno,* 237 F.3d 591, 597 (6th Cir.2001) ("both actual knowledge and 'willful blindness' fall within the definition of the term 'acquiescence.'") (citation omitted). The Senate did not in its understandings to the Convention modify the terms awareness and acquiescence with the adjective "knowing" as the INS does in their briefs to the BIA and this court. Nor did the Senate require willful acceptance. Rather, the Senate ratified a version of the Convention that eliminated an understanding that acquiescence required a public official's *knowledge* and replaced it with an understanding that acquiescence required only a public official's *awareness*. The Senate Committee on Foreign Relations expressly stated that the purpose of requiring awareness, and not knowledge, "is to make it clear that both actual knowledge and 'willful blindness' fall within the definition of the term 'acquiescence.'" S. Exec. Rep. 101–30, at 9.

The BIA in Zheng's case, however, required Zheng to prove more than awareness of torture by public officials. Instead, the BIA required that "[w]hen the alien alleges a likelihood of torture from non-governmental sources, he or she must demonstrate that government officials *'are willfully accepting of'* the non-governmental source's' torturous activities.' *See Matter of S–V–,* Interim Decision 3430, 2000 WL 562836 at 8 (BIA 2000)," (emphasis added).

In *Matter of S–V–,* the BIA en banc denied relief under the Convention Against Torture to a respondent who asserted that if he were removed to Columbia he would be tortured by non-governmental guerrilla, narcotrafficking, and paramilitary groups. In discussing acquiescence, the BIA stated:

> In its resolution of advice and consent to the Convention Against Torture, the United States Senate included an understanding replacing the word "knowledge" in this definition of acquiescence with the word "awareness," indicating that actual knowledge of activity constituting torture is not required. ... The Senate Committee on Foreign Relations clarified the point by stating that "(t)he purpose of this condition is to make it clear that both actual knowledge and 'willful blindness' fall within the definition of the term 'acquiescence.'"

22 I. & N. 1306 (citations omitted). After directly quoting the Senate's intent, the BIA then "interpret[ed] the regulation at 8 C.F.R. § 208.18(a) [defining acquiescence] to be limiting"—more limiting than the Senate's just quoted intent to require awareness and not actual knowledge. *Id.* Creating a standard more stringent than Congress clearly intended, the BIA held that to demonstrate acquiescence "the respondent *must do more than show that the officials are aware* of the activity constituting torture but are powerless to stop it. He must demonstrate that the Colombian officials are *willfully accepting of* the guerillas' torturous activities." *Id.* (emphases added). Quoting the Oxford Universal Dictionary, the BIA stated "[t]o interpret the term [acquiescence] otherwise would be to misconstrue the meaning of 'acquiescence,' the dictionary definition of which is 'silent or passive assent.'" *Id.* (quoting *Oxford Universal Dictionary* 17 (3d ed.1955)).[8]

---

**8.** *But see The American Heritage Dictionary of the English Language* (4th ed. 2000) ("Synonyms: assent, agree, accede, acquiesce, consent.... These verbs denote acceptance of and often belief in another's views, proposals, or actions. *Assent* implies agreement, especially as a result of deliberation: *They readily assented to our suggestion.* ... *Acquiesce* suggests passive assent because of inability or unwillingness to oppose: *I acquiesced in their decision despite my misgivings.*") (http:// dic-

■ To interpret the term acquiescence as the BIA did, however, misconstrues and ignores the clear Congressional intent quoted by the BIA merely a paragraph above its restrictive holding. The BIA's interpretation and application of acquiescence impermissibly requires more than awareness and instead requires that a government be willfully accepting of a third party's tortuous activities. There is nothing in the understandings to the Convention approved by the Senate, or the INS's regulations implementing the Convention, to suggest that anything more than awareness is required. Yet, the BIA ignored the Senate's clear intent and constructed its own interpretation of acquiescence, an interpretation that requires more than awareness, includes "willfully accepting of," and seemingly excludes "willful blindness." Under this narrowed interpretation of acquiescence, the BIA stated that "[t]he relevant inquiry under the Convention Against Torture ... is whether governmental authorities would ... 'willfully accept' atrocities committed against persons in the respondent's position." *In re Y–L–, A–G, R–S–R–,* 23 I. & N. Dec. 270, 283, 2002 WL 358818 (BIA 2002). The correct inquiry as intended by the Senate is whether a respondent can show that public officials demonstrate "willful blindness" to the torture of their citizens by third parties, or as stated by the Fifth Circuit, whether public officials "would turn a blind eye to torture." *Ontunez–Tursios,* 303 F.3d at 355.

Citing *INS v. Aguirre–Aguirre,* 526 U.S. 415, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999), the INS argues that "[t]he definition of torture has been properly left to INS." *See Aguirre–Aguirre,* 526 U.S. at 425, 119 S.Ct. 1439 (citation omitted) ("[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.' "). The INS, however, is wrong. The definition of torture has been properly left, not to the INS, but to Congress, who instructed the INS to "prescribe regulations to implement the obligations of the United States under Article 3 of the [Convention], *subject to any* reservations, *understandings,* declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." FARRA § 2242(b) (emphasis added). One of the "understandings" in the Senate resolution of ratification of the Convention Against Torture was that acquiescence of a public official requires "awareness" and not "knowledge" or "willful[ ] accept[ance]." Because "the intent of Congress is clear, that is the end of the matter; for th[is] court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778.

To the extent that decisions such as *Matter of S–V–* and *In re Y–L, A–G, R–S–R–,* require actual knowledge and "willful[ ] accept[ance]"—contrary to clear congressional intent to require only awareness—we disapprove of those decisions. We note that "we have taken care not to exceed our authority, and not to second-guess the BIA. Our decision[ ] simply give[s] effect to the will of Congress" [9] that the BIA adhere to the definition of acquiescence intended by Congress when it ratified the Convention Against Torture and created legislation implementing Article 3 of the Convention Against Torture; the BIA may not construe its own, more limited definition of acquiescence.

In light of the Supreme Court's recent decision in *INS v. Ventura,* 537 U.S. 12,

tionary.reference.com/search?q=assent) (last visited May 30, 2003).

9. *Borja v. INS,* 175 F.3d 732, 739 (9th Cir. 1999) (en banc).

123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam), we do not now review the evidence under the correct standard of acquiescence to determine if substantial evidence supports the BIA's conclusion that Zheng does not qualify for relief under the Convention Against Torture. Rather, following *Ventura*, we remand to the BIA to give the BIA the first opportunity to apply the correct standard of "acquiescence" as intended by the Senate in ratifying the Convention—a standard that includes awareness and willful blindness and does not require actual knowledge or "willful[ ] accept[ance]." *See id.* at 355 ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands.").

We note that the government maintains in its possession significant information about Chinese smuggling rings and their relationship to the Chinese government that may support the petitioner's "aware-

ness" claim. For example, the U.S. Department of State International Information Programs website includes a useful collection of articles and reports under the heading *Chinese Human Smuggling.*[10] Given that the regulations implementing the Convention Against Torture provide that "all evidence relevant to the possibility of future torture shall be considered," 8 C.F.R. § 208.16(c)(3), it would further the purposes of the Convention were the BIA, on remand, to supplement the record with such material information.

## IV. CONCLUSION

In sum, we disapprove of the BIA's decision in *Matter of S–V–* that—contrary to clear congressional intent—requires a showing that a government is willfully accepting of the torture of its citizens by a third party. We grant Zheng's petition for review, vacate the BIA's decision, and remand this case to the BIA for further proceedings consistent with this opinion.

---

**10.** Http://usinfo.state.gov/regional/ea/china aliens (last visited May 30, 2003). This website includes a section titled "Resources" which includes links to reprinted articles, reports, and book excerpts. These articles discuss the magnitude of violence snakeheads inflict on Chinese immigrants and the involvement of the Chinese government in smuggling. *See* Kolin Chin, *The Social Organization of Chinese Human Smuggling, in Global Human Smuggling* (David Kyle & Rey Koslowski, eds., 2001), http://usinfo.state.gov/regional/ea/chinaaliens/smuggling2.htm (last viewed May 30, 2003) ("An officer of the INS enforcement division told me that ... '[t]he INS has evidence to show that Chinese law enforcement authorities are behind alien smuggling.' ... [A] number of [Chinese smuggled into the United States testify that] their snakeheads were either former or active Chinese government employees."); Peter Kwong, *Impact of Chinese Human Smuggling on the American Labor Market, in Global Human Smuggling* (David Kyle & Rey Koslowski, eds., 2001), http://usinfo.state.gov/regional

/ea/chinaaliens/smuggling3.htm (last viewed May 30, 2003) ("Regular use of violence is one way to instill fear in the minds of the illegals in order to gain their compliance. Smugglers usually pay enforcers to terrorize the illegals during the voyage to the United States."); Louise I. Shelley, *The Nexus of Organized International Criminals and Terrorism* (2002), http://usinfo.state.gov/regional/ea/chinaaliens/nexus.htm (last viewed May 30, 2003) ("In China, as in Russia, the collusion of government officials is central to the capacity of smugglers to operate."); Jonathan M. Winer, *Alien Smuggling: Elements of the Problem and the U.S. Response*, Trends in Organized Crime, Spring 1998, http://usinfo.state.gov/regional/ea/chinaaliens/elements.htm (last viewed May 30, 2003) ("Alien smuggling is made possible by staggering levels of official corruption.... [M]igrants are often subjected to inhumane or dangerous treatment and, in the case of Chinese, to extreme forms of violence. Migrants die from suffocation, abandonment, accidents, or brutality by smugglers.").

PETITION GRANTED, ORDER VA-
CATED, AND REMANDED.