**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 10, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

FONKA AROUNA MOUNDIH,

    Petitioner,

v.

PAMELA J. BONDI, United States
Attorney General,[*]

    Respondent.

No. 24-9508
(Petition for Review)

_____

### ORDER AND JUDGMENT[**]
_____

Before **HARTZ**, **PHILLIPS**, and **EID**, Circuit Judges.
_____

Fonka Moundih, a native and citizen of Cameroon, entered the United States

and became a lawful resident. Years later, Moundih was convicted of fraud, and the

government initiated removal proceedings against him based on that aggravated

felony. During the removal proceedings, Moundih sought withholding of removal

and protection under the Convention Against Torture, arguing that he would likely be

subjected to torture in Cameroon.

---

[*] On February 5, 2025, Pamela J. Bondi became Attorney General of the
United States. Consequently, her name has been substituted for Merrick B. Garland
as Respondent, pursuant to Fed. R. App. P. 43(c)(2).

[**] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

The immigration judge denied Moundih's application for relief from removal, finding that Moundih failed to show it was more likely than not that he would be tortured in Cameroon. On appeal, the Board of Immigration Appeals affirmed. This petition for review followed. Because substantial evidence supports the BIA's finding that Moundih failed to show that it was more likely than not that he would be tortured, we affirm the BIA's decision and deny Moundih's petition for review. We also grant Moundih's motion for leave to proceed *in forma pauperis*.

## I.

Fonka Moundih, a Cameroonian citizen, entered the United States in 2005 and was eventually afforded legal permanent resident status in 2013. In 2017, Moundih was arrested in connection with a currency counterfeiting scheme; he was convicted and sentenced in the United States District Court for the Central District of California in 2020.

Then, in 2023, the Department of Homeland Security initiated removal proceedings against Moundih. Specifically, DHS charged Moundih as removable from the United States under 8 U.S.C. § 1227(a)(2)(A)(iii) based on the prior 2020 conviction of an aggravated felony involving fraud or deceit, as defined in 8 U.S.C. § 1101(a)(43)(U). At the removal proceedings, the immigration judge ("IJ") sustained DHS's factual allegations and the charge of removability, finding that Moundih was removable for committing an aggravated felony involving fraud or deceit that caused losses exceeding $10,000.

Moundih thereafter applied for relief from removal, requesting asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). At the immigration hearing, Moundih testified that he first came to the United States in 2005 because he believed his life was in danger due to a conflict with a high-ranking Cameroonian official, Colonel Emile Joel Bamkoui, who dated the same woman as Moundih (a woman with whom Moundih also shares a child). Moundih testified that he had never personally encountered Colonel Bamkoui—and had only seen him on television—but nevertheless believed he was under a threat of death from Colonel Bamkoui because his partner had told him so.

Moundih also testified that he had another threatening encounter related to Colonel Bamkoui in 2014. That year, Moundih visited Cameroon, and the apartment he rented there was surrounded by Cameroonian police, who may or may not have had a warrant for his arrest. According to Moundih, a neighbor alerted him that the "Rapid Intervention Brigade" (a police unit led by Colonel Bamkoui, which Moundih claimed is "like the CIA," A.R. at 147) came "looking" for him at his apartment. *Id.* Moundih testified that he believed the officers were looking for him because Colonel Bamkoui was "still mad" at him. *Id.* at 169. That incident drove Moundih into hiding and led him to return to the United States. Moundih now believes he would be arrested and harmed in Cameroon because Colonel Bamkoui remains a high-ranking, "powerful" officer there and still holds a grudge against Moundih. *Id.* at 167–69, 173.

Moundih also stated that he believes he would be harmed in Cameroon based on political opinions imputed to him, because the Cameroonian police discovered videos of police brutality that Moundih had previously sent his sister. Moundih's sister was arrested in Cameroon after she took her own video of police brutality. According to Moundih, authorities searched his sister's phone, discovered the videos Moundih had sent to her, and told his sister to tell Moundih to stop sending these videos. The authorities also detained and assaulted his sister, causing her to spend two days in the hospital.

Nevertheless, Moundih testified that the Cameroonian police never returned to his sister's home to inquire about Moundih or the videos. And according to Moundih himself, his political activity is limited to following one Cameroonian social justice group online and supporting it passively as a member.

Following the immigration proceedings, the IJ issued an oral decision denying Moundih's application for relief and protection from removal and ordering his removal to Cameroon. As to his request for withholding of removal, the IJ determined that Moundih's conviction for conspiracy to commit fraud was an aggravated felony and a particularly serious crime—thereby making Moundih ineligible for asylum and withholding of removal.[1]

Next, the IJ considered Moundih's request for CAT protection. The IJ found that Moundih had never been tortured in Cameroon in the past and that there was "no

---

[1] The IJ also found, in the alternative, that Moundih failed to meet his burden on the merits of his claim for withholding of removal.

evidence that he will be tortured if he returns to Cameroon." *Id.* at 60. Further, the IJ concluded that Moundih's claims that Colonel Bamkoui has been targeting him and that government officials went to his home when he visited Cameroon in 2014 to look for him were both unduly "speculative." *Id.* The IJ noted that Moundih "was able to fly into Cameroon" in 2014, which was "closer to the time that he fled Cameroon, [and] nothing happened to him." *Id.* at 61. Indeed, he was able to "rent an apartment[] and live there." *Id.*

The IJ also rejected Moundih's claim that, based on reports of government abuses and mistreatment in Cameroon, the government would torture him. While acknowledging the existence of civil strife in the country, the IJ concluded that Moundih's "limited political activism" was insufficient to show he would more likely than not be in a similar situation to other Cameroon citizens who have suffered mistreatment. *Id.* The IJ noted also that Moundih's sister, who still lives in Cameroon, was "labeled" as a political opponent based on the videos she took of police brutality but had not been subjected to harm that amounted to torture. *Id.* Furthermore, the IJ found that there is "no reason to believe" that Moundih would be tortured, as he is even less politically involved than his sister. *Id.* at 62. Accordingly, the IJ denied Moundih's application for relief and CAT deferral and ordered his removal to Cameroon.

Moundih then appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). The BIA dismissed the appeal. As an initial matter, the BIA found that Moundih waived any challenge to the IJ's finding that his conviction was for a

5

particularly serious crime, which rendered Moundih ineligible for asylum and withholding of removal.  As to Moundih's request for CAT protection, the BIA agreed with the IJ that Moundih failed to meet his burden to show that he would more likely than not suffer torture upon his return to Cameroon by or with the acquiescence of a government official.  The BIA concluded that the IJ drew "permissible inferences" from the facts, the evidence of poor conditions in Cameroon, and other evidence in the record, and the BIA accordingly affirmed the IJ's findings and upheld the denial of CAT protection.

This petition for review followed.  We have jurisdiction to review Moundih's petition under 8 U.S.C. § 1252.

## II.

We review the BIA's legal determinations de novo and its findings of fact for substantial evidence.  *Xue v. Lynch*, 846 F.3d 1099, 1104 (10th Cir. 2017).  Under the substantial-evidence standard, we evaluate whether the BIA's "factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole."  *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004).  We reverse these determinations only if "the evidence not only *supports* [a contrary] conclusion, but *compels* it."  *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992); *Dallakoti v. Holder*, 619 F.3d 1264, 1267 (10th Cir. 2010).

"Our scope of review directly correlates to the form of the BIA decision."  *Sidabutar v. Gonzales*, 503 F.3d 1116, 1123 (10th Cir. 2007).  Where, as here, a single member of the BIA affirms an IJ's decision, we review the BIA's opinion and

6

the grounds for its conclusion, but "we are not precluded from consulting the IJ's more complete explanation of those same grounds." *Neri-Garcia v. Holder*, 696 F.3d 1003, 1008–09 (10th Cir. 2012) (citation omitted).

**A.**

Removable noncitizens have three avenues to lawfully remain in the United States:  (1) asylum via refugee status, 8 U.S.C. § 1158; (2) withholding of removal (i.e., executive stay on the removal order), *id.* § 1231; or (3) protection under CAT, 1465 U.N.T.S. 85, 23 I.L.M. 1027, *see* Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681–823 (1998), codified as note to 8 U.S.C. § 1231; 8 C.F.R. § 208.17 (2002) (implementing regulations).  Here, Moundih has waived any challenge to the IJ's determination that he is ineligible for asylum and withholding of removal.[2]  Thus, only the third avenue—protection under CAT—is at issue.

The eligibility requirements for CAT relief differ from the requirements for asylum or withholding of removal.  *See Uanreroro v. Gonzales*, 443 F.3d 1197, 1202 (10th Cir. 2006).  Unlike the latter two forms of relief, CAT eligibility does not require a showing of mistreatment motivated by a protected characteristic (such as race or political opinion), but instead is determined by the likelihood and severity of the potential mistreatment.  *See Ritonga v. Holder*, 633 F.3d 971, 978 (10th Cir.

---

[2] As explained, the IJ held that Moundih was ineligible for asylum and withholding of removal because of his felony conviction for aggravated fraud in relation to a currency scheme, which the IJ found was a "particularly serious crime" within the meaning of 8 U.S.C. § 1158(b)(2).  A.R. at 54–55.  Moundih did not challenge that determination before the BIA, *see id.* at 3, and he likewise does not challenge it in this appeal.

2011).  Specifically, to receive protection under CAT, a noncitizen must establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c)(2).  Torture, in turn, is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  *Id.* § 1208.18(a)(1).

In assessing the likelihood of future torture for CAT eligibility purposes, the IJ must consider all relevant evidence.  This includes (1) evidence of past torture, (2) evidence concerning whether the petitioner could safely relocate to a part of the country of removal where he would not likely be tortured, (3) evidence of "gross, flagrant or mass violations of human rights within the country of removal," and (4) "[o]ther relevant information regarding conditions in the country of removal."  *Id.* § 1208.16(c)(3)(i)–(iv).[3]

Furthermore, the standards for CAT eligibility are higher than those required for other forms of asylum.  This Court has held that if a noncitizen cannot establish a "well-founded fear under the asylum standard," he "will necessarily fail to meet the higher standards required for . . . withholding of removal under [CAT]."  *Solomon v. Gonzales*, 454 F.3d 1160, 1163 (10th Cir. 2006).  Likewise, a noncitizen cannot

---

[3] An IJ's determination as to whether there is a likelihood of future torture is a finding of fact that we review under the substantial-evidence standard.  *See Xue*, 846 F.3d at 1104.

demonstrate a likelihood of *future* torture (as is required under 8 C.F.R. § 1208.16(c)(2)) merely by showing instances of *past* torture (although, as explained, evidence of past torture may be relevant to the determination). *Niang v. Gonzales*, 422 F.3d 1187, 1196 (10th Cir. 2005).

Nor can a noncitizen establish eligibility for CAT protection simply "by stringing together a series of suppositions to show he will more likely than not be tortured. Instead, he must prove each 'step in th[e] hypothetical chain' of events between his removal and the torture he fears." *Medina-Moreno v. Barr*, 841 F. App'x 72, 75 (10th Cir. 2020) (quoting *In re J-F-F-*, 23 I. & N. Dec. 912, 917–18 (A.G. 2006)). Finally, although a noncitizen can point to evidence of a pattern of human rights violations in the country of removal, such evidence alone is insufficient to demonstrate CAT eligibility; instead, "[s]pecific grounds must exist that indicate the individual would be *personally* at risk." *In re S-V-*, 22 I. & N. Dec. 1306, 1313 (B.I.A. 2000) (citation omitted), *overruled on other grounds*, *Zheng v. Ashcroft*, 332 F.3d 1186, 1188–89 (9th Cir. 2003).

**B.**

On appeal, Moundih argues that the IJ and the BIA failed to adequately consider four categories of evidence: (1) evidence of government corruption and poor country conditions in Cameroon; (2) evidence of his sister's own encounters with and mistreatment by the Cameroonian government; (3) evidence that Moundih has been labeled as a political dissident in Cameroon; and (4) evidence that Colonel Bamkoui is seeking out Moundih in order to harm him. We consider each in turn.

Moundih begins by arguing that the IJ and the BIA ignored evidence of government corruption and other poor "country conditions" in Cameroon. Aplt. Br. at 9. As he did in the proceedings below, Moundih points to human-rights reports describing "arbitrary and unlawful killings through the use of [government] force," as well as the arrests and torture of "[m]ore than a hundred" political dissidents in the past five years. *Id.* at 9–10. These reports, Moundih claims, evince a "landscape of torture of political dissenters in Cameroon." *Id.* at 11. The IJ, on the other hand, described Cameroon as undergoing only "some civil strife"—a description Moundih claims is "a wildly unfair characterization [of] atrocities" occurring in the country. *Id.* at 9. And because of that "unfair characterization," Moundih contends, the IJ and the BIA must have ignored the reports altogether. *Id.* at 11.

But the IJ and the BIA *did* consider those reports—they just found the reports to be unsupportive of Moundih's claim. In its decision, the IJ expressly stated that it "looked at all 521 pages filed by [Moundih] in support of the Country Reports in Cameroon," including specific reports related to an "activist who returned to Cameroon and was labeled as an enemy of the state and was detained." A.R. at 61. The IJ did not ignore these reports, nor did the IJ discredit their veracity, as Moundih insists; rather, the IJ found that the civil unrest that the reports described was not likely to affect Moundih himself, given that Moundih did not show "that he even belongs to any of those regions [affected by government corruption] or that any harm will come to him because he belongs to those regions." *Id.* Further, the IJ found that Moundih had only "limited political activism," such that he was not in a position

10

similar to other Cameroonian citizens who had been subjected to government mistreatment. *Id.*

The IJ's conclusions on this score are supported by evidence in the record. For instance, at a hearing before the IJ, Moundih testified that although he became a member of one particular political organization in 2015 and still "like[s] their activities," he has never protested, has never become familiar with details of the organization's mission, and has not visited the organization's website since the time he first joined. *Id.* at 150–51, 154–56. And, as the IJ pointed out, no evidence suggests that Moundih has been so involved with the political organization as to be at a risk of government mistreatment—in fact, some of Moundih's own evidence suggests he was hardly involved in politics at all.

Accordingly, it was reasonable for the IJ to conclude that Moundih's evidence of poor country conditions could not establish a likelihood that he personally would be tortured in Cameroon. Although a noncitizen can point to evidence of a pattern of human rights violations in the country of removal, such evidence alone is insufficient to demonstrate CAT eligibility; instead, "[s]pecific grounds must exist that indicate the individual would be *personally* at risk." *In re S-V-*, 22 I. & N. Dec. at 1313 (citation omitted); *see Hernandez-Torres v. Lynch*, 642 F. App'x 814, 818–19 (10th Cir. 2016) (affirming IJ's conclusion that evidence of generally poor country conditions, coupled with an individual's limited political involvement, was insufficient to demonstrate a likelihood of future torture).

Next, Moundih argues that the IJ and the BIA gave improper weight to the evidence he presented regarding his sister's own mistreatment by the Cameroonian government. Specifically, Moundih argues that the IJ and the BIA erred in finding that Moundih's sister, who remains in Cameroon, "has not been tortured or subject[ed] to any forms of punishment or treatment that the Court can find amounts to torture." *See* Aplt. Br. at 11 (referencing A.R. at 62). According to Moundih, the evidence regarding his sister demonstrates that she was "assaulted, threatened, intimidated," and subjected to other mistreatment by the Cameroonian government, which resulted in chest trauma and two days of hospitalization. *Id.* at 12. And Moundih suggests that the IJ and the BIA did not properly consider this evidence, given that they did not find that she had been tortured.

We disagree. To be sure, Moundih submitted a letter from his sister stating that she had been mistreated by the Cameroonian police. But, as the IJ pointed out, the letter did not describe any particular police conduct that might satisfy the statutory definition of torture. Likewise, although the IJ acknowledged that Moundih's sister had been labeled as a political opponent and had been arrested, the IJ also noted that his sister had actually been released by Cameroonian officials, and that her subsequent medical treatment was relatively minor. Even the BIA specifically "acknowledge[d] the events asserted by [Moundih's] sister at the hands of Cameroonian authorities," while nevertheless affirming the IJ's conclusion that "Cameroonian authorities did not inflict harm that amounts to the narrow legal definition of torture" provided in the CAT standards. A.R. at 4 n.2.

12

Thus, neither the IJ nor the BIA ignored or gave inadequate weight to Moundih's evidence regarding his sister.  The IJ based its findings on Moundih's own evidence, including the fact that Moundih himself was less politically involved than his sister.  Although Moundih's evidence might suggest his sister was previously subjected to some form of government mistreatment, that evidence alone provides no basis to conclude that Moundih *himself* would likely be subjected to government torture.  Accordingly, the IJ and the BIA's conclusions to that effect are supported by substantial evidence in the record.[4]

Moundih's third argument is that the IJ and the BIA erred in deeming it "speculative" that Moundih would be subjected to torture based on his limited political activism, because—according to Moundih—the fact that "officials found political correspondence" between him and his sister made him a targeted political dissident.  Aplt. Br. at 13.  Moundih also renews a related argument he made before the IJ and the BIA, claiming that the Cameroonian government will target him based on his imputed political opinion.

This argument falls short, too.  The IJ expressly considered Moundih's political activism, but it nevertheless took "issue with the imputed political claim."

---

[4] Moundih briefly suggests that the IJ's failure to adequately consider the evidence concerning his sister amounts to a violation of his procedural due process rights.  But Moundih's argument fails for two reasons:  (1) first, as indicated by the handful of cases he cites, an IJ's failure to consider evidence rarely amounts to a procedural due process violation, absent extreme and unique circumstances not present here; and (2) the IJ in this case did *not* fail to adequately consider Moundih's evidence, as explained above.

13

A.R. at 57.  Moreover, contrary to Moundih's argument, the IJ acknowledged that Cameroonian officials found political correspondence between Moundih and his sister on his sister's phone, and that those officials told Moundih's sister to tell him not to share further information.  But the IJ determined that those facts alone were "not enough . . . to find that [Moundih] has a well-founded fear of returning to Cameroon based on imputed political opinion."  *Id.* at 58.  Further, the IJ considered other evidence that might show a political opinion that could be imputed to Moundih and thereby subject him to torture, but the IJ concluded—based on the evidence— that Moundih's political activism was limited.  Indeed, as explained above, the IJ noted that no evidence indicated any active or recent support—including financial support—for the organization with which Moundih claimed to be involved.

Again, then, the IJ did not "miss[] or ignore[] [Moundih's] argument that his *imputed* political opinion will subject him to the targeting from the Cameroonian government."  Aplt. Br. at 13.  Instead, the IJ simply determined that Moundih's communications with his sister and his own limited political involvement were insufficient to show an imputed political opinion in the first place.  Thus, the IJ's conclusions as to Moundih's political activism or possible imputed political opinions are supported by substantial evidence in the record—the very evidence Moundih suggests it should have relied on.[5]

---

[5] Moundih also argues that the IJ and the BIA "ignored" a prior decision of this Court, *Takwi v. Garland*, 22 F.4th 1180 (10th Cir. 2022).  Aplt. Br. at 14.  Moundih's reliance on *Takwi* is misplaced.  In *Takwi*, we held that while the BIA did not err in concluding that a noncitizen was competent to participate in removal

Finally, Moundih argues that the IJ and the BIA erred in concluding that

Moundih's claims regarding Colonel Bamkoui were too speculative to support CAT

eligibility.  Moundih claims that there was a legitimate basis to believe that Colonel

Bamkoui was seeking out Moundih—both because Colonel Bamkoui is generally

reputed as "a person that would seek to torture and eliminate anyone who he deems

an enemy," and because of Moundih's relationship with Colonel Bamkoui's supposed

girlfriend.  *Id.* at 14–15.  Moreover, Moundih insists that the only plausible

explanation for why Cameroonian officials came to his apartment in 2014 was that

Colonel Bamkoui was targeting him—rather than that the officials had a warrant for

his arrest, as Moundih's neighbor claimed—given that Cameroon's "corrupt law

enforcement system . . . would not have legitimate arrest warrants."  *Id.* at 15.

Once more, Moundih's arguments fail.  Moundih conflates general

suppositions about Colonel Bamkoui and the Cameroonian government with a

personalized basis, grounded in evidence, to believe that he will be tortured.  Indeed,

the record confirms that Moundih's fears regarding Colonel Bamkoui are speculative.

For one thing, Moundih never personally encountered Colonel Bamkoui—having

only ever seen him on television—and he only believed he was under a threat of

---

proceedings, the BIA *did* err in failing to afford the noncitizen a presumption of
credibility without explicitly making an adverse determination to the contrary.  22
F.4th at 1186–88.  Contrary to Moundih's assertions, we did *not* conclude that Takwi
*was* credible with regard to his claims about the Cameroonian government's
misconduct; instead, we remanded to the BIA on the credibility issue.  *Id.* at 1188.
That result—coupled with several other factual and procedural distinctions from
Moundih's case—makes *Takwi* irrelevant here.

death from Colonel Bamkoui because his partner had told him so.  Moreover, Moundih's relationship with Colonel Bamkoui's supposed girlfriend occurred in 2005—nearly two decades ago.  At present, nothing indicates that Colonel Bamkoui is still seeking to harm Moundih (if he ever was at all).  And although police went to Moundih's apartment in Cameroon during his time there in 2014, nothing suggests that the police harmed him at that time, nor that they indicated an intent to harm him in the future.  Indeed, the fact that Moundih was able to travel to Cameroon in 2014 without experiencing torture or other mistreatment suggests that his fear of persecution by Colonel Bamkoui is unfounded.

Lacking evidence of current, particularized government interest in Moundih personally, it was not error for the IJ and the BIA to conclude that Moundih's claims were unduly speculative.  *See Xue*, 846 F.3d at 1111 (affirming, both in the less-stringent asylum and withholding contexts and in the stricter CAT context, a finding that a noncitizen's fear of future persecution was unduly speculative where the noncitizen presented evidence that the government previously targeted him, but not that the government was still doing so).  Thus, the IJ's finding that Moundih was not likely to be tortured by Colonel Bamkoui is supported by substantial evidence in the record.

Ultimately, Moundih's arguments—before the IJ, before the BIA, and before us here—all boil down to a "hypothetical chain" of events that cannot establish CAT eligibility.  *See Medina-Moreno*, 841 F. App'x at 75 (quoting *In re J- F- F-* , 23 I. & N. Dec. at 917–18).  To be sure, Moundih's evidence indicates that Cameroon has

16

experienced some degree of government corruption and abuse. But the evidence is insufficient to show that Moundih personally was so politically involved—in general or with Colonel Bamkoui—as to be at a risk of experiencing torture. To the contrary, the record demonstrates that Moundih's political activism was limited, and the events he points to as a basis for his fear of torture are either decades old or unrelated to him personally. The BIA's determination that Moundih had not established a likelihood of torture is therefore supported by substantial evidence.

## III.

Moundih also filed a motion for leave to proceed *in forma pauperis*. To proceed *in forma pauperis*, litigants must show a "reasoned, nonfrivolous argument on the law and facts in support of the issues raised in the action." *Lister v. Dep't of Treasury*, 408 F.3d 1309, 1312 (10th Cir. 2005). Because Moundih presented law and facts to challenge the BIA's decision, Moundih's petition for review is nonfrivolous. We therefore grant his motion for leave to proceed *in forma pauperis*.

## IV.

Accordingly, we AFFIRM the BIA's decision and DENY Moundih's petition for review, but we GRANT Moundih's motion for leave to proceed *in forma pauperis*.

Entered for the Court


Allison H. Eid
Circuit Judge

17